# <u>Exhibit B</u>

*DEED OF LEASE AGREEMENT*

*BY AND BETWEEN*

**1627 K ASSOCIATES LIMITED PARTNERSHIP**

*AND*

**HARRISON CAREER INSTITUTE**

*DATED*

December 9 , *2003*

## DEED OF LEASE AGREEMENT

THIS DEED OF LEASE AGREEMENT (hereinafter referred to as "Lease"), made this _____ day of _____, 2003, by and between 1627 K ASSOCIATES LIMITED PARTNERSHIP, a limited partnership organized and existing under the laws of Delaware, having an address at c/o Cambridge Asset Advisors Limited Partnership, 560 Herndon Parkway, Suite 210, Herndon, Virginia 20170 (hereinafter referred to as the "Landlord"), and HARRISON CAREER INSTITUTE, a corporation organized and existing under the laws of the State of New Jersey, having an address at Plaza 1000, Main Street, Suite 310, Voorhees, New Jersey 08043 (hereinafter referred to as the "Tenant").

WITNESSETH, THAT FOR AND IN CONSIDERATION of the mutual entry into this Lease by the parties hereto, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each party hereto, the Landlord hereby leases to the Tenant and the Tenant hereby leases from the Landlord all of that certain office space, situated and lying in the District of Columbia (initially containing approximately 1,800 square feet of floor area comprised of the front portion of the ninth (9th) floor as outlined on the attached Exhibit B-2 (the "Initial Premises") and, in the event the Lease is not terminated pursuant to Section 1 of the attached Exhibit E, on May 1, 2004) the floor area shall be increased to include a total of approximately 9,915 square feet of floor area comprised of a portion of the ninth (9th) floor (including the Initial Premises) and the entire tenth (10th) floor), as outlined and attached hereto as Exhibit A (hereinafter collectively referred to as the "Premises"), and located in a building (hereinafter referred to as the "Building") at 1627 K Street, N.W. (the Premises, the remainder of the Building, the land upon which the Building is located, and any other buildings or improvements to be constructed thereon being hereinafter referred to collectively as the "Property").

SUBJECT TO THE OPERATION AND EFFECT of any and all instruments and matters of record or in fact.

UPON THE TERMS AND SUBJECT TO THE CONDITIONS which are hereinafter set forth:

SECTION 1.    TERM.

1.1.    **Length.** This Lease shall be for a term (hereinafter referred to as the "Term") (a) commencing upon the execution hereof (hereinafter referred to as the "Commencement Date", except that, if the date of such commencement is hereafter advanced or postponed by written agreement of the parties hereto, the date to which it is advanced or postponed shall thereafter be the "Commencement Date" for all purposes of this Lease), and (b) terminating at terminating at 12:00 A.M., local time, on the Tenth (10th) anniversary of the first (1st) day of the first (1st) full calendar *Sh. be (year)/(month)* following the Phase II Commencement Date, as such term is defined below (hereinafter referred to as the "Termination Date", except that if the date of such termination is hereafter advanced or postponed by written agreement of the parties hereto or pursuant to the provisions of Section 1 or Section 6 of the attached Exhibit E, the date to which it is advanced or postponed shall thereafter be the "Termination Date").   Notwithstanding anything herein to the contrary, so long as the Lease has not been terminated pursuant to the provisions of Section 1 on the attached Exhibit E, upon the earlier of (i) "substantial completion" of the improvements to be rendered pursuant to Section 5.1.1.(b), as such term is set described therein (specifically excluding the Initial Improvements) or (ii) May 1, 2004 (the "Phase II Commencement Date"), the Premises shall be increased to (i) include approximately 2,559 square feet of additional space on the ninth (9th) floor of the Building and (ii) approximately 5,556 rentable square feet of space, such space being the entire tenth (10th) floor of the Building.

1.2.    **Surrender.** The Tenant shall at its expense, at the expiration of the Term or upon any earlier termination of this Lease, (a) promptly surrender to the Landlord possession of the Premises (including any fixtures or other improvements which, under the provisions of Section 5, are owned by the Landlord) in good order and repair (ordinary wear and tear excepted) and broom clean, (b) remove therefrom the Tenant's signs, goods and effects and any machinery, trade fixtures and equipment used in conducting the Tenant's trade or business and not owned by the Landlord, and (c) repair any damage to the Premises or the Building caused by such removal.

1.3.    **Holding Over.**

1.3.1.  If the Tenant continues to occupy the Premises after the expiration of the Term or any earlier termination of this Lease after obtaining the Landlord's express, written consent thereto:

(a)  such occupancy shall (unless the parties hereto otherwise agree in writing) be deemed to be under a month-to-month tenancy, which shall continue until either party hereto notifies the other in writing, by at least thirty (30) days before the end of any calendar month, that the notifying party elects to terminate such tenancy at the end of such calendar month, in which event such tenancy shall so terminate;

(b)  anything contained in the foregoing provisions of this Section to the contrary notwithstanding, the rental payable for each such monthly period shall equal one-twelfth (1/12) of the Base Rent and the Additional Rent payable under the provisions of subsection 2.2 (calculated in accordance with such provisions of subsection 2.2 as if this Lease had been renewed for a period of twelve (12) full calendar months after such expiration or earlier termination of the Term or such renewal); and

(c)  except as provided in subsection (b) above, such month-to-month tenancy shall be upon the same terms and subject to the same conditions as those set forth in the provisions of this Lease; provided, that if the Landlord gives the Tenant, by at least thirty (30) days before the end of any calendar month during such month-to-month tenancy, written notice that such terms and conditions (including any thereof relating to the amount or payment of Rent) shall, after such month, be modified in any manner specified in such notice, then such tenancy shall, after such month, be upon the said terms and subject to the said conditions, as so modified.

1.3.2.  If the Tenant continues to occupy the Premises after the expiration of the Term or any earlier termination of this Lease without obtaining the Landlord's express, written consent thereto, such occupancy shall be on the same terms and subject to the same conditions as those set forth in the provisions of paragraph 1.3.1., except that, anything contained in the provisions of this Lease to the contrary notwithstanding, (a) the rental payable during the initial two (2) month period of such occupancy shall equal one hundred fifty percent (150%) of the rental which would be payable during such period under the provisions of subparagraph 1.3.1.(b), had the Tenant obtained the Landlord's express, written consent to such occupancy, as aforesaid and thereafter, the rental payable shall equal two hundred percent (200%) of the rental which would be payable during such period under the provisions of subparagraph 1.3.1.(b), had the Tenant obtained the Landlord's express, written consent to such occupancy, as aforesaid, and (b) nothing in the provisions of paragraph 1.3.1. or any other provision of this Lease shall be deemed in any way to alter or impair the Landlord's right immediately to evict the Tenant or exercise its other rights and remedies under the provisions of this Lease or applicable law on account of the Tenant's occupancy of the Premises without having obtained such consent.

## SECTION 2.    RENT

2.1.    **Amount.** As rent for the Premises (all of which is hereinafter referred to collectively as "Rent"), the Tenant shall pay to the Landlord in advance, without demand, deduction or set off, for the entire Term hereof, all of the following:

2.1.1.  Base Rent.  In consideration of the Premises and subject to the termination options set forth in Section 1 and Section 6 of the attached Exhibit E, Tenant covenants and agrees to pay to Landlord a Base Rent each Lease Year in the amount set forth in Exhibit D, attached hereto and made a part hereof. This Base Rent shall be paid in equal monthly installments on the first (1st) day of each month, in advance, without demand, notice, offset or deduction, at such place as shall be designated by Landlord, beginning on the Commencement Date. If the Commencement Date is on a date other than the first (1st) day of the month, then the first rent payment shall include a pro rata portion of such Base Rent and all other payments provided for under this Lease for any part of the month prior to the first (1st) full month of the lease term.

2.1.2.  Lease Year.  As used in the provisions of this Lease, the term "Lease Year" means (a) the period commencing on the Phase II Commencement Date and terminating on the first

(1st) anniversary of the last day of the calendar month containing the Commencement Date, and (b) each successive period of twelve (12) calendar months thereafter during the Term.

2.1.3.  Additional Rent.  Additional rent (hereinafter referred to as "Additional Rent") in the amount of any payment referred to as such in any provision of this Lease which accrues while this Lease is in effect. Any Additional Rent shall be payable to Landlord within thirty(30) days of demand except as otherwise provided for herein.

**2.2.    Increases in Operating Expenses and Real Estate Taxes.**

2.2.1.  Commencing on the first (1st) day of the second (2nd) Lease Year and for each year, or fraction thereof, thereafter during the Term, Tenant shall pay to Landlord, as Additional Rent hereunder, without diminution, set-off or deduction, (a) an amount for Tenant's proportionate share of Operating Expenses, as defined in Section 2.2.4.1 below, and (b) an amount for Tenant's proportionate share of Real Estate Taxes (as defined in Section 2.2.4.2 below).  Tenant's proportionate share of Operating Expenses shall be equal to the sum of (x) the product obtained by multiplying Tenant's Operating Expense Proportionate Share (as calculated pursuant to Section 2.2.3.1 below) for each such year by Operating Expenses for such year in excess of Base Operating Expenses (as hereinafter defined).  Tenant's proportionate share of Real Estate Taxes shall be equal to the product obtained by multiplying Tenant's Real Estate Tax Proportionate Share (as calculated pursuant to Section 2.2.3.2. below) by Real Estate Taxes paid in such year in excess of Base Real Estate Taxes (as hereinafter defined).

2.2.2.  Base Year.  For purposes of this Section 2.2, the term "Base Operating Expenses" shall mean the Operating Expenses for the Building incurred during the **calendar year 2004**, and the term "Base Real Estate Taxes" shall mean the Real Estate Taxes incurred during the **calendar year 2004**.

2.2.3.  Operating Expense and Real Estate Tax Proportionate Share Calculation.

2.2.3.1.  For all purposes hereof, Tenant's Operating Expense Proportionate Share shall be the proportion that the rentable square feet of space in the Premises bear to the total rentable square feet of space in the Building.  Upon the Phase II Commencement Date, Tenant's Operating Expense Proportionate Share is **fifteen and 46/100 percent (15.46%)** (based upon 64,153 rentable square feet of space in the Building).

2.2.3.2.  For all purposes hereof, Tenant's Real Estate Tax Proportionate Share shall be the proportion that the rentable square feet of space in the Premises bear to the total rentable square feet of space in the Building.  Upon the Phase II Commencement Date, Tenant's Real Estate Tax Proportionate Share is **fifteen and 46/100 percent (15.46%)** (based on 64,153 rentable square feet of space in the Building).

2.2.4.  Definitions of "Operating Expenses" and "Real Estate Taxes".

2.2.4.1.  For all purposes hereof, the term "Operating Expenses" shall mean any and all expenses incurred by Landlord in connection with the operation, management, maintenance and repair of the Building, including, but not limited to, expenses for char services and cleaning supplies; elevator maintenance; window cleaning; electricity and other utilities furnished to the office space of the Building, and utility charges in connection therewith; water and sewer charges; expenses for the operation, maintenance, repair and replacement of the heating, air conditioning, electrical and other Building systems servicing office tenants in the Building; the costs and expenses incurred in connection with the provision of the utilities and services, including, but not limited to, the maintenance, repair and replacement of the Building systems furnishing such utilities and/or services; energy management services contracts with independent contractors; management fees; legal and accounting fees; trash removal, including all costs incurred in connection with waste product recycling (except to the extent any such costs are charge directly to the tenants); the cost of operating any fitness facility, conference facility, transportation service (furnished by an independent contractor), concierge service, or other amenity furnished generally to tenants; salaries, wages, medical, surgical, general welfare benefits (including group life insurance), pension payments, payroll taxes, and worker's compensation insurance for employees of Landlord and the property manager engaged in the operation, management, maintenance and repair of the Building; license fees, any local and state surcharges or special charges, casualty, liability or other

insurance; access control services and costs; building supplies; uniforms and dry cleaning; snow and ice removal or prevention; repair and maintenance of the grounds, including costs of landscaping, gardening and planting; service or management contracts with independent contractors, including, but not limited to, access control; telephone, telegraph, postage, stationery supplies and other materials and expenses required for the routine operation of the Building; any capital expenditures incurred either to reduce Operating Expenses, to comply with any governmental law, order or regulation in connection with Operating Expenses, or to replace existing equipment and machinery used in connection with Operating Expenses, such capital costs to be amortized over such reasonable period as Landlord shall determine, together with interest at the rate paid by Landlord on any funds borrowed for such expenditures; and any other expense or charge which would be included in Operating Expenses in accordance with sound accounting and management principles generally accepted with respect to the operation of first-class office buildings in the Washington, D.C. metropolitan area. Notwithstanding anything to the contrary contained herein, Operating Expenses shall not include any of the following: painting, redecorating or other work which Landlord performs for specific tenants, the expenses of which are paid by such tenants; ground rent; interest and amortization of funds borrowed by Landlord (except as specifically provided above); leasing commissions, and advertising, legal, space planning and construction expenses incurred in procuring tenants for the Building; salaries, wages or other compensation paid to officers or executives of Landlord in their capacities as officers or executives of Landlord in their capacities as officers and executives; fees paid to affiliates of Landlord to the extent that any such fee exceeds the then-existing market rates for the service provided if provided by a person or entity that is not an affiliate of Landlord; and any other expenses for which Landlord actually receives reimbursement from insurance, condemnation awards, other tenants or any other source.

2.2.4.2.  For all purposes hereof, the term "Real Estate Taxes" shall mean all taxes and assessments, general or special, ordinary or extraordinary, foreseen or unforeseen, assessed, levied or imposed upon the Building or the Property, or assessed, levied or imposed upon the fixtures, machinery, equipment or systems in, upon or used in connection with the operation of the Building or the Property under the current or any future taxation or assessment system or modification of, supplement to or substitute for such system. Real Estate Taxes shall include all reasonable expenses (including, but not limited to, attorneys' fees, disbursements and actual costs) incurred by Landlord in obtaining or attempting to obtain a reduction of such taxes, rates or assessments. Landlord shall have the right to pay any special assessment by installments, and in such event Real Estate Taxes shall include such installments and interest paid on the unpaid balance of the assessment.

2.2.5.  Estimated Payments.  Tenant shall make monthly payments of Tenant's share of Operating Expenses and Real Estate Taxes on an estimated basis, based on Landlord's reasonable estimate of Operating Expenses and Real Estate Taxes for such fiscal year. Commencing on the first (1st) day of the second (2nd) Lease Year, and continuing on the first (1st) day of each month thereafter during the Term, Tenant shall pay to Landlord, as Additional Rent, one-twelfth (1/12) of Landlord's estimate of Tenant's share of Operating Expenses and Real Estate Taxes for the then-current fiscal year. Notwithstanding anything to the contrary contained herein, Landlord shall have the right to calculate the Operating Expenses and Real Estate Taxes for the Building on a calendar year basis instead of on a fiscal year basis, in which event all references in this Lease to "fiscal year" shall be replaced with references to "calendar year"; provided, however, that in no event shall Landlord collect Operating Expenses or Real Estate Taxes from the tenants of the Building in an aggregate amount which is in excess of one hundred percent (100%) of the Operating Expenses and Real Estate Taxes paid by Landlord for any such twelve (12)-month period, whether based on a fiscal year or a calendar year.

2.2.6.  Annual Statements.  Landlord shall provide to Tenant a statement (the "Expense Statement") setting forth the total Operating Expenses and Real Estate Taxes for each fiscal year and Tenant's share thereof for such fiscal year calculated according to the formula set out in Section 2.2.3 above. Within thirty (30) days after the delivery of such Expense Statement, Tenant shall pay to Landlord any deficiency between the amount shown as Tenant's share of Operating Expenses and Real Estate Taxes for such fiscal year and the estimated payments made by Tenant toward such amount in accordance with Section 2.2.5 above. In the event Tenant shall have made excess estimated payments, the excess shall be applied against payments of Monthly Base Rent and estimated payments of Operating Expenses and Real Estate Taxes for the then-current fiscal year, unless the Lease shall have expired, in which event Landlord shall refund such excess to Tenant with the delivery of the Expense Statement. Tenant's share of Operating Expenses and Real Estate Taxes

for any partial fiscal year shall be determined by multiplying the amount of Tenant's share for the full fiscal year by a fraction, the numerator of which is the number of days during such fiscal year falling within the Term and the denominator of which is 365.

2.2.7.  In the event that less than ninety-five percent (95%) of the total rentable square feet in the Building that is leased or available for lease by office tenants is occupied by such tenants at all times during any fiscal year, then Operating Expenses for such fiscal year shall include all additional costs, expenses and disbursements that Landlord reasonably determines would have been incurred had ninety-five percent (95%) of such area been occupied at all times during such fiscal year.

2.2.8.  In addition to Tenant's share of Operating Expenses and Real Estate Taxes, Tenant shall pay to Landlord as Additional Rent Tenant's share (as reasonably determined by Landlord) of any taxes imposed upon the Premises, the Property or the Building or the rents payable hereunder in the nature of a sales or use tax or other levy (but not including any income or net profits tax).

**2.3.     When due and payable.**

2.3.1  The Base Rent for any Lease Year shall be due and payable in twelve (12) consecutive, equal monthly installments, in advance, on the first (1st) day of each calendar month during such Lease Year; provided, that the first monthly installment of the Base Rent will be due and payable upon lease execution.

2.3.2.  Any Additional Rent accruing to the Landlord under any provision of this Lease shall, except as is otherwise set forth herein, be due and payable when the installment of the Base Rent next falling due after such Additional Rent accrues and becomes due and payable, unless the Landlord makes written demand upon the Tenant for payment thereof at any earlier time, in which event such Additional Rent shall be due and payable at such time.

2.3.3.  Each such payment shall be made promptly when due, without any deduction or set off whatsoever, and without demand. In the event such payment is not received within three (3) business days of the date when due, provided same is not caused as a result of the U.S. Post Office failure to timely deliver mail as a result of an act of terrorism, Tenant shall pay to the Landlord as Additional Rent, a late charge equaling ten percent (10%) of such payment.

**2.4.     Where payable.**  The Tenant shall pay the Rent, in lawful currency of the United States of America, to the Landlord by delivering or mailing it (postage prepaid) to the Landlord's address which is set forth in Section 16, or to such other address or in such other manner as the Landlord from time to time specifies by written notice to the Tenant.  Any payment made by the Tenant to the Landlord on account of Rent may be credited by the Landlord to the payment of any Rent then past due before being credited to Rent currently falling due.  Any such payment which is less than the amount of Rent then due shall constitute a payment made on account thereof, the parties hereto hereby agreeing that the Landlord's acceptance of such payment (whether or not with or accompanied by an endorsement or statement that such lesser amount or the Landlord's acceptance thereof constitutes payment in full of the amount of Rent then due) shall not alter or impair the Landlord's rights hereunder to be paid all of such amount then due, or in any other respect.

**2.5.     Tax on Lease.**  If federal, state or local law now or hereafter imposes any tax, assessment, levy or other charge (other than any income, inheritance or estate tax) directly or indirectly upon (a) the Landlord with respect to this Lease or the value thereof, (b) the Tenant's use or occupancy of the Premises, (c) the Base Rent, Additional Rent or any other sum payable under this Lease, or (d) this transaction, then (except if and to the extent that such tax, assessment, levy or other charge is included in the Operating Expenses or Real Estate Taxes) the Tenant shall pay the amount thereof as Additional Rent to the Landlord upon demand, unless the Tenant is prohibited by law from doing so, in which event the Landlord may, at its election, terminate this Lease by giving written notice thereof to the Tenant.

**2.6.     Security deposit.**

2.6.1.  Simultaneously with the entry into this Lease by the parties hereto, the Tenant shall deposit with the Landlord the sum of Twenty Six Thousand Twenty Six and 88/100 Dollars

$26,026.88

(\$22,026.88), which shall be retained by the Landlord as security for the Tenant's payment of the Rent and performance of all of its other obligations under the provisions of this Lease.

2.6.2. On the occurrence of an Event of Default, the Landlord shall be entitled, at its sole discretion,

(a) to apply any or all of such sum in payment of (i) any Rent then due and unpaid, (ii) any expense incurred by the Landlord in curing any such Event of Default, and/or (iii) any damages incurred by the Landlord by reason of such Event of Default (including, by way of example rather than of limitation, that of reasonable attorneys' fees); and/or

(b) to retain any or all of such sum to reimburse for any or all damages suffered by the Landlord by reason of such Event of Default. If at any time Landlord draws upon the security deposit in accordance with this section Tenant upon demand agrees to immediately pay to Landlord an amount sufficient to return the security deposit to the amount stated above.

2.6.3. On the termination of this Lease, any of such sum which is not so applied or retained shall be returned to the Tenant within forty-five (45) days of the Lease termination date.

2.6.4. Such sum shall not bear interest while being held by the Landlord hereunder.

2.6.5. No Mortgagee (as that term is defined by the provisions of Section 12) or purchaser of any or all of the Property at any foreclosure proceeding brought under the provisions of any Mortgage (as that term is defined by the provisions of Section 12) shall (regardless of whether the Lease is at the time in question subordinate to the lien of any Mortgage under the provisions of Section 12 or otherwise) be liable to the Tenant or any other person for any or all of such sum (or any other or additional security deposit or other payment made by the Tenant under the provisions of this Lease), unless both (a) the Landlord has actually delivered it in cash to such Mortgagee or purchaser, as the case may be, and (b) it has been specifically identified, and accepted by the Lender or such purchaser, as the case may be, as such and for such purpose.

## SECTION 3.    USE OF PREMISES.

**3.1.**    The Tenant shall, continuously throughout the Term occupy and use the Premises for and only for general office purposes.  Landlord acknowledges that the Premises shall be used for business, vocational and educational training purposes.

**3.2.**    In its use of the Premises and the remainder of the Property, the Tenant shall not violate any applicable law, ordinance or regulation.

**3.3.    Signs.** The Tenant shall have the right to erect from time to time within the Premises such signs as it desires, in accordance with applicable law, except that the Tenant shall not erect any sign within the Premises in any place where such sign is visible primarily from the exterior of the Premises, unless the Landlord has given its express, written consent thereto.

**3.4.    Relocation of Tenant.** The Landlord shall have the right from time to time during the Term, at the Landlord's expense, to relocate the Premises from their present location within the Building to another location within the Building having at least the same floor area as that of the Premises as shown on Exhibit A, provided that the Landlord gives the Tenant written notice of the Landlord's intention to do so at least thirty (30) days before undertaking such relocation.  The Landlord shall, in such event, at the Landlord's expense, install within the Premises as so relocated improvements of the same quality and quantity as those theretofore made by the Tenant or the Landlord to the Premises before such relocation, and on the completion of such installation shall cause the Tenant's machinery, furniture, fixtures and equipment (including, but not limited to, telephone, computer, network and other communications equipment the existing in the Premises) and signage located within the Premises to be moved to the Premises as so relocated.  Upon the completion of such relocation, this Lease shall automatically cease to cover the space constituting the Premises immediately before such relocation, and shall automatically thereafter cover the space to which the Premises have been relocated, as aforesaid, all on the same terms and subject to the same conditions as those set forth in the  provisions of this Lease as in effect immediately before such relocation, and all without the necessity of further action by either party hereto; provided, that each party hereto shall, promptly upon its receipt of a written request therefor from the other, enter

into such amendment of this Lease as the requesting party considers reasonably necessary to confirm such relocation.

**3.5.  Parking.** Landlord shall endeavor to provide **two (2)** parking spaces on the exterior of the Building and **one (1)** parking space in the parking facility located under the Building, provided that Tenant enters a monthly contract directly with Landlord, Landlord's managing agent or the operator of the parking facility if such facility is or at a future date is operated by an independent third party, as the case may be, for each such parking space at the monthly rental in effect from time to time. Tenant, at its sole option, may elect to discontinue its contract for the parking facility upon thirty (30) days prior notice to Landlord. In the event Tenant elects to discontinue its contract(s) for parking, Landlord shall be free and clear to lease such spaces to another tenant or third party and Tenant's right to said space(s) shall be null and void. Such spaces shall be solely for use by Tenant and its employees for the parking of automobiles and shall be subject to the terms and conditions set forth in such monthly parking contracts. Tenant acknowledges that Landlord does not assume any responsibility for any damage or loss to any automobiles parked in the garage, or to any personal property located therein, or for any injury sustained by any person in or about the garage. The current charge for parking is $195.00 per space, per month.

**3.6.  Waste Removal.** Tenant shall comply, at its sole cost and expense, with all orders, requirements and conditions now or hereafter imposed by any ordinances, laws, orders and/or regulations (hereinafter collectively called "regulations") of any governmental body having jurisdiction over the Premises or the Building, whether required of Landlord or otherwise, regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash (hereinafter collectively called "waste products"), including, but not limited to, the separation of such waste products into receptacles reasonably approved by Landlord and the removal of such receptacles in accordance with any collection schedules prescribed by such regulations. Landlord reserves the right (i) to refuse to accept from Tenant any waste products that are not prepared for collection in accordance with any such regulations, (ii) to require Tenant to arrange for waste product collection at Tenant's sole cost and expense, utilizing a contractor reasonably satisfactory to Landlord, and (iii) to require Tenant to pay all costs, expenses, fines, penalties or damages that may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with any such regulations. Notwithstanding the foregoing, if Tenant is unable to comply with Landlord's standard procedures regarding the internal collection, sorting, separation and recycling of waste products, Landlord shall use reasonable efforts to arrange for alternative procedures for Tenant and Tenant shall pay Landlord all additional costs incurred by Landlord with respect thereto.

**3.7.  Environmental Compliance.**

**3.7.1.** Tenant shall not use the Premises, the Building or the Property for the use, generation, treatment, storage or disposal of "toxic substances", "contaminants", "pollutants", "hazardous materials", "hazardous waste", "hazardous substances" or "oil" (collectively, "Hazardous Materials") as such terms are defined under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601 *et seq.*, as amended from time to time, the Resource Conservation and Recovery Act of 1986, 42 U.S.C., Sections 6901 *et seq.*, as amended from time t time, and any and all other statutes or laws which regulate the use of hazardous and/or dangerous substances, and the regulations promulgated thereunder and any and all state and local laws, statutes, codes, ordinances, rules and regulations, without the express prior written consent of Landlord, and then only to the extent that the presence and/or discharge of the Hazardous Materials is (a) properly licensed and approved by all appropriate governmental officials and in accordance with all applicable laws and regulations and (b) in compliance with any terms and conditions set forth in said prior written approval by Landlord. Tenant may use such Hazardous Materials as are used for ordinary office purposes in the ordinary course of Tenant's business, provided that the use, storage and disposal thereof is in accordance with all applicable statutes, laws, codes, ordinances, rules and regulations, and any manufacturer's instructions; and provided further that Tenant may not discharge any Hazardous Materials except as provided by applicable statutes, laws, codes, ordinances, rules and/or regulations, and specifically may not discharge any Hazardous Materials in any public sewer or any drain and/or drainpipe leading or connected thereto. Tenant shall promptly give written notice to Landlord of any communication received by Tenant from any governmental authority or other person or entity concerning any complaint, investigation or injury regarding any use, generation, treatment, storage or disposal (or alleged use, generation, treatment, storage or disposal) by Tenant of any Hazardous Materials. Landlord shall have the right (but not the obligation) to conduct such investigations or tests (or both) as Landlord shall deem necessary

with respect to any such complaint, investigation or inquiry, and Tenant, at its expense, shall take such action (or refrain from taking such action) as Landlord may request in connection with such investigations and tests by Landlord.

       3.7.2.  Notwithstanding anything in this Lease to the contrary, Tenant shall not materially adversely affect (as determined by Landlord) the indoor air quality of the Premises or the Building, it being understood and agreed that the preceding clause shall apply to (and take precedence over any other provision of this Lease concerning) the use of the Premises, the type of equipment, furniture, furnishings, fixtures and personal property that may be brought into the Premises, the construction materials used in the leasehold improvements, the standard of maintenance required for the Premises and compliance with any smoking policy now or hereafter adopted for the Building by Landlord or required by law.

       3.7.3.  The covenants contained within this Section 3.7 shall survive the expiration or earlier termination of this Lease.

## SECTION 4.    INSURANCE AND INDEMNIFICATION.

    **4.1.    Increase in risk.**  The Tenant:

       4.1.1.  shall not do or permit to be done any act or thing as a result of which either (a) any policy of insurance of any kind covering (i) any or all of the Property or (ii) any liability of the Landlord in connection therewith may become void or suspended, or (b) the insurance risk under any such policy would (in the opinion of the insurer thereunder) be made greater; and

       4.1.2.  shall pay as Additional Rent the amount of any increase in any premium for such insurance resulting from any breach of such covenant.

    **4.2.    Insurance to be maintained by Tenant.**

       4.2.1.  The Tenant shall maintain at its expense, throughout the Term, insurance against loss or liability in connection with bodily injury, death, property damage or destruction, occurring within the Premises or arising out of the use thereof by the Tenant or its agents, employees, officers or invitees, visitors and guests, under one or more policies of/commercial general liability insurance having such limits as to each as are reasonably required by the Landlord from time to time, but in any event of not less than a total of Three Million Dollars ($3,000,000.00) for bodily injury to or death of all persons or property damage or destruction in any one occurrence. In addition, Tenant shall carry and keep in full force and effect from and after Tenant's occupancy of the Premises and at all times during the Term (i) an all-risk insurance policy covering all of Tenant's personal property and leasehold improvements in the Premises for not less than the full insurable value and replacement cost thereof without reduction for depreciation and (ii) business interruption insurance in minimum amounts typically carried by prudent tenants engaged in operations similar to Tenant's operations, but in no event less than the annual Base Rent then in effect during any Lease Year.  All proceeds of such all-risk insurance shall be used solely to restore, repair or replace Tenant's personal property and leasehold improvements.  Tenant also shall obtain such additional amounts of insurance and additional types of coverage as Landlord reasonably may require from time to time.

       4.2.2.  All commercial general liability and property damage insurance policies and any other insurance policies carried by Tenant shall (i) be issued by insurance companies authorized to do business in the District of Columbia, with a then-current Alfred M. Best Company, Inc. (or if it no longer exists, a comparable rating service) general policy holder's rating of "A" or better and financial size category reasonably satisfactory to Landlord; (ii) designate, as additional insureds, Landlord, Landlord's managing agents, Landlord's mortgagee(s) and any other parties with a financial interest in Landlord, the Building or the Land designated by Landlord; (iii) be written as primary policy coverage and not contributing with or in excess of any coverage which Landlord may carry; (iv) provide for thirty (30) days' prior written notice to Landlord of any cancellation or other expiration of such policy; and (v) contain contractual liability coverage insuring performance by Tenant of the indemnity provisions of this Lease.  In addition, all property damage insurance policies shall either permit or contain an express waiver of any right of recovery (by subrogation or otherwise) by the insurance company against Landlord and Landlord's mortgagees.  Tenant shall deliver to Landlord either a copy of each such policy of insurance or a certificate evidencing the

coverages required hereunder prior to occupancy. Renewal certificates shall be provided by Tenant on an annual basis. Neither the issuance of any insurance policy required hereunder nor the minimum limits specified herein with respect to Tenant's insurance coverage shall be deemed to limit or restrict in any way Tenant's liability under this Lease.

4.2.3. At least five (5) days before the Commencement Date, the Tenant shall deliver to the Landlord a certificate of each such policy, and (b) at least thirty (30) days before any such policy expires (or in such reasonable amount of time as may be necessary to obtain such a certificate from the insurance provided however that in the event Tenant is unable to provide a certificate, Tenant must provide verification from the insurance provider that said policy(s) is in place and effective so that no interruption of coverage shall occur), the Tenant shall deliver to the Landlord an original or a signed duplicate copy of a replacement policy therefor; provided, that so long as such insurance is otherwise in accordance with the provisions of this Section, the Tenant may carry any such insurance under a blanket policy covering the Premises for the risks and in the minimum amounts specified in paragraph 4.2.1, in which event the Tenant shall deliver to the Landlord two (2) insurer's certificates therefor in lieu of an original or a copy thereof, as aforesaid.

4.3.    **Insurance to be maintained by Landlord.** The Landlord shall maintain throughout the Term all-risk insurance upon the Building, including as needed but not limited to Personal Property, Loss of Rents, Glass, Boiler and Machinery, General Liability and Umbrella Liability in at least such amounts and having at least such forms of coverage as are required from time to time by the Landlord's lender. The cost of the premiums for such insurance and of each endorsement thereto and of any applicable deductibles therefor shall be deemed, for purposes of the provisions of Section 2, to be a cost of operating and maintaining the Property.

4.4.    **Waiver of subrogation.** If either party hereto is paid any proceeds under any policy of insurance naming such party as an insured, on account of any loss, damage or liability, then such party hereby releases the other party hereto, to and only to the extent of the amount of such proceeds, from any and all liability for such loss, damage or liability, notwithstanding that such loss, damage or liability may arise out of the negligent or intentionally tortious act or omission of the other party, its agents or employees; provided, that such release shall be effective only as to a loss, damage or liability occurring while the appropriate policy of insurance of the releasing party provides that such release shall not impair the effectiveness of such policy or the insured's ability to recover thereunder. Each party hereto shall use reasonable efforts to have a clause to such effect included in its said policies, and shall promptly notify the other in writing if such clause cannot be included in any such policy.

4.5.    **Liability of parties.** Except if and to the extent that such party is released from liability to the other party hereto pursuant to the provision of subsection 4.4:

4.5.1. the Landlord (a) shall be responsible for, and shall indemnify and hold harmless the Tenant against and from any and all liability arising out of, any injury to or death of any person or damage to any property, occurring anywhere upon the Property, if, only if and to the extent that such injury, death or damage is proximately caused by the negligent or intentionally tortious act or omission of the Landlord or its agents, officers or employees, but (b) shall not be responsible for or be obligated to indemnify or hold harmless the Tenant against or from any liability for any such injury, death or damage occurring anywhere upon the Property (including the Premises), (i) by reason of the Tenant's occupancy or use of the Premises or any other portion of the Property, or (ii) because of fire, windstorm, act of God or other cause unless solely caused by such negligence or intentionally tortious act or omission of the Landlord, as aforesaid; and

4.5.2. subject to the operation and effect of the foregoing provisions of this subsection, the Tenant shall be responsible for, and shall defend, indemnify and hold harmless the Landlord against and from, any and all liability or claim of liability (including without limitation reasonable attorney's fees) arising out of any injury to or death of any person or damage to any property, occurring within the Premises, or if caused by the negligent or intentionally tortuous act or omission of Tenant, its employees, agents or invitees, on the Property.

## SECTION 5.    IMPROVEMENTS TO PREMISES.

5.1.    5.1.    By Landlord.

5.1.1.(a) *Improvements to the Initial Premises.* Landlord's general contactor, Camcon, L.P., shall commence construction of the Initial Premises upon (i) execution of this Lease, (ii) approval of the construction budget by Tenant, (ii) receipt of funds from Tenant in accordance with the provisions of this Section 5.1.1.(a), and (iv) receipt of all necessary approvals and permits required by the proper governing authorities (the "Initial Improvements"). The Initial Improvements shall be completed in accordance with the plans prepared or to be prepared by Tenant's architect. The cost of the Initial Improvements shall be borne directly by Tenant, such costs being deemed Additional Rent, and shall be paid by Tenant to Landlord in accordance with the following schedule: (i) Seventy percent (70%) prior to the commencement of said improvements and (ii) Thirty percent (30%) upon substantial completion and delivery, of the Initial Improvements. In the event the Lease is not terminated as provided for in Paragraph 1 of Exhibit E, Tenant may request that it be reimbursed for the costs directly incurred by Tenant with respect to the Initial Improvements, which costs may include architectural and engineering fees, paint, carpet, and permit fees. Landlord, within thirty (30) days of Tenant's written request for reimbursement, shall make a one-time payment to Tenant and such payment shall be deducted from the Allowance set forth in Section 5.1.1.(b). Landlord shall not be required to make such reimbursement unless and until the termination option provided for in Paragraph 1 of Exhibit E is removed.)

5.1.1.(b) *Leasehold Improvements.* If, and only if, Tenant's termination option pursuant to Paragraph 1 of Exhibit E is not exercised and is of no further force and effect, Landlord shall construct the Premises, on a "turn-key" basis, in accordance with the plans prepared or to be prepared by Tenant's architect; provided however that Landlord's costs for constructing the Premises (including costs reimbursed to Tenant for the construction of the Initial Premises) shall not exceed an Thirty Five and 00/100 Dollars ($35.00) per rentable square foot (the "Allowance"). The Allowance shall be applied toward the "hard" and "soft" costs of construction of the Premises, including architectural and engineering fees, paint, carpet, and permit fees, as approved by Tenant in a written construction project budget and construction schedule to be submitted by Landlord's general contractor to Tenant for advance approval prior to the commencement of any construction of improvements. The cost of any additional improvements which exceed the Allowance, including the cost of architectural and engineering services, shall be borne solely by Tenant and shall be promptly paid by Tenant to Landlord as provided below. Tenant's failure to pay any such amount when due and payable shall be deemed an Event of Default in the payment of Additional Rent under the Lease. The cost of the improvements which exceed the Allowance, as well as the costs of other services required as a result of such improvements, shall be paid to Landlord in accordance with the following schedule: (i) Seventy percent (70%) prior to the commencement of said improvements and (ii) Twenty percent (20%) upon substantial completion and delivery, of the improvements as defined herein, and (iii) ten percent (10%) upon completion of the Punch List Items, as such items are further described herein. Upon substantial completion of the improvements, the parties representatives shall inspect the Premises, have all systems demonstrated and prepare a "punch list" which contains the Punch List Items as hereinafter defined. As used herein, "substantial completion" shall mean the date which Landlord completes and delivers the improvements to the Premises in a good and workmanlike manner and in accordance with plans and specifications approved by both Landlord and Tenant, excluding Punch List Items and Long Lead Items (as such terms are defined below), as evidenced by a certificate from the individual supervising such construction for Landlord and by the issuance of a certificate of final inspection or similar instrument from the proper governing authorities which entitles the Premises to qualify for the issuance of a certificate of occupancy. As used herein, Punch List Items are those items which entail one or more minor, incomplete, or insubstantial details of construction, decoration, mechanical adjustment or installation, or other work, whose absence or incompleteness does not materially and adversely affect the use and occupancy of the Premises for the normal conduct of Tenant's business ("Punch List Items"). Landlord will repair or complete the Punch List Items within a reasonable period after the Commencement Date. Long Lead Items shall be those items or materials which Landlord's general contractor cannot be obtained and/or installed in a timely manner so as to permit the completion of the Initial Leasehold Improvements. Tenant and Tenant's architect shall endeavor to select finishes, material and items that will not be Long Lead Items and shall work together in good faith with Landlord's general contractor to select alternates which would not be Long Lead Items. Landlord and Tenant shall provide full and complete access to the Premises by Landlord's Contractor to commence and complete all improvements to the Premises in a timely manner, both before and after the Commencement Date, until completion of the improvements contemplated in Section 5 hereof. Landlord's contractor will diligently work to complete all improvement in a timely manner.

5.1.1.(c) Acknowledgement of Risks. Landlord hereby acknowledges that Tenant has requested and Landlord has agreed that Tenant will occupy the Premises during the installation and completion of the leasehold improvements contemplated in Section 5.1.1.(b) above. Tenant acknowledges that it and its employees, customers, invitees, guests, agents, representatives, contractors and other persons shall occupy the Premises at their own risk and Tenant shall indemnify and hold harmless Landlord and its partners, members, officers, directors, employees, contractors, agents and representatives (the "Indemnified Parties") from and against any and all damage, costs, expenses (including attorneys' fees), liabilities and/or claims any of the Indemnified Parties suffer or incur or make as a result of any bodily injury, death or property damage Tenant and/or any of its employees, customers, invitees, guests, agents, representatives, contractors or other persons suffer or incur as a result of taking occupancy of the Premises while it is under construction, unless the death, injury or damage was sustained as a result of the intentionally tortious or negligent act of Landlord or the Indemnified Parties. Tenant acknowledges the risks inherent in the occupancy of space that is under construction or adjacent to space under construction and hereby releases the Indemnified Parties from any liability resulting therefrom or related thereto, unless attributable to the intentionally tortious or negligent act of Landlord or the Indemnified Parties. Tenant acknowledges that the improvements will include, without limitation, painting and carpeting the Premises and that, as a result, Tenant and its employees, customers, invitees, agents, representatives, contractors and other persons will be exposed to certain odors, fumes, noise and other nuisances. Tenant acknowledges the risks inherent in occupying space while such activities are in process and hereby accepts such risks on its behalf and on behalf of its employees, customers, invitees, guests, agents, representatives, contractors or other persons visiting or occupying the Premises.

5.1.1.(d) Pre-Occupancy Work. Tenant shall, upon execution of the Lease, be permitted access to the Premises to prepare the Premises for its occupancy, and to install its equipment and such furniture and fixtures and shall further have such access to the Premises to install those items considered Pre-Occupancy Work (defined below), during the construction of the improvements to be rendered in accordance with Section 5.1.1. Such entry and use by Tenant shall not be deemed to constitute Tenant's occupancy for term or rent commencement purposes; provided, however, any furniture, fixtures and equipment placed by Tenant in or about the Premises or the Building prior to the Commencement Date shall be at the sole risk of Tenant, and Landlord shall not in any manner be responsible therefore except by virtue of negligent or intentional acts of its employees or its Contractor; provided, further, except for Tenant's obligation to pay Rent, such use and entry by Tenant and Tenant's contractors shall be subject to all of the terms and conditions of this Lease, such as but not limited to, Tenant's obtaining all insurance and Landlord's prior approval of all such Pre-Occupancy Work, which said approval shall not be unreasonably withheld; provided, further, during such Pre-Occupancy Work and during Tenant's move-in, Landlord shall cause its Building personnel and managing agent to provide Tenant, with reasonable access to the Premises, elevators and loading areas in accordance with reasonable rules and regulations governing such work comparable to access customarily provided by owners of other comparable first-class office buildings in Washington, D.C. central business district under similar circumstances. The above notwithstanding, Tenant's Contractors (as hereinafter defined) shall not interfere with Landlord's contractor or managing agent in their efforts to complete the Initial Leasehold Improvements in a timely manner. Additionally, all work performed by Tenant's Contractors shall be coordinated through Landlord's contractor or managing agent, including but not limited to Pre-Occupancy Work and Tenant's move-in to the Premises. As used herein, "Pre-Occupancy Work" shall mean such work in, on or about, entry onto, and use of the Premises and Building by Tenant and Tenant's contractors, subcontractors, agents, or servants (the "Tenant's Contractors") for the sole purposes of: (A) making measurements, preparation of plans and specifications, (B) installing cabling, fixtures, shelving, lighting, cabinetry, telephone equipment, and other special equipment, if any, and other similar pre-occupancy items for or on behalf of Tenant; (C) installing Tenant's own access control system for the Premises (if required by Tenant) and (D) moving Tenant's personal property, fixtures and trade-fixtures to the Premises.

5.1.1.(e) Tenant Plans. Tenant shall provide to Landlord for approval complete sets of construction drawings and specifications prepared at Tenant's expense (subject to reimbursement from the Allowance) by an architect approved by Landlord in its reasonable discretion. Such drawings and specifications shall include such of the following as are deemed necessary in the reasonable determination of Landlord and/or Landlord's contractor:

a.    Scope of Work (description)
b.    Demolition Plan
c.    Partition Plans including Electrical and Telephone Outlet Plans

d.    Reflected Ceiling Plans
e.    Wall Finish Plan
f.    Floor Finish Plan
g.    Elevations
h.    Mechanical, engineering and plumbing plans

Tenant shall deliver such complete construction drawings and specifications to Landlord and Landlord shall have ten (10) business days from the date it receives the same to review such drawings and specifications and notify Tenant as to whether they are approved by Landlord, which approval shall not be unreasonably withheld but may be conditioned by Landlord in its reasonable discretion. If Tenant's drawings and specifications are not approved by Landlord, Landlord shall inform Tenant of the reason and Tenant shall have the opportunity to submit revised plans (the "Revised Plans") and the Landlord shall have ten (10) business days from the date it receives the Revised Plans to review the same and notify the Tenant as to whether the Revised Plans are approved by Landlord. This process shall continue until the Revised Plans are in form and substance satisfactory to Landlord and Tenant.

5.1.1.(f)  Unused Allowance.  Tenant may elect to apply up to Seven and 00/100 Dollars ($7.00) per rentable square foot of the Allowance toward its data and telephone cabling and installation, moving related expenses, or may apply such amount toward future rental payments under the lease.

5.1.1.(g)  Additional Allowance:  In the event the cost of the Initial Leasehold Improvements exceeds the Allowance and such excess is primarily caused by conditions as they relate to the Building and the Building's systems which were unforeseen as of the execution date hereof, specifically excluding any excess costs that are a result of Tenant's construction requirements, Landlord shall provide an additional allowance of up to Five and 00/100 Dollars ($5.00) per square foot (the "Additional Allowance"), which is to be applied to solely toward the cost of such additional work. In such an event, the Additional Allowance shall be amortized into the Base Rent on a straight-line basis over the term of the lease.

5.1.2.  Landlord's general contractor shall construct the improvements based upon the construction drawings (as hereinafter defined) prepared in accordance with Section 5.1.1 above. In the event the parties do not agree to a budget as contemplated under the provision of Section 5.1.1. above, Landlord shall competitively bid the major trades and such bids shall be made available for Tenant's review. Tenant, at its discretion, may select two (2) subcontractor from each trade to bid on the project, provided said subcontractors meet the reasonable requirements of Landlord and are licensed, bonded, and insured to do such work in the District of Columbia. All bids will be "open book" and upon receipt of all bids, Landlord and Tenant shall jointly select the subcontractors to perform the work to be completed within the Premises. There shall be no additional fee for supervision in the event Landlord's general contractor performs all work to be completed within the Premises. It is specifically understood that the foregoing bid process may cause a delay in the occupancy of the Premises by Tenant and shall such delay shall not modify Tenant's obligation to pay Base Rent hereunder.

5.1.3. the Landlord shall use its reasonable efforts to complete such improvements by the date on which the Tenant is entitled to occupy the Premises pursuant to this Lease, but shall have no liability to the Tenant hereunder if prevented from doing so by reason of any (a) strike, lock-out or other labor troubles, (b) governmental restrictions or limitations, (c) failure or shortage of electrical power, gas, water, fuel oil, or other utility or service, (d) riot, war, insurrection or other national or local emergency (e) accident, flood, fire or other casualty, (f) adverse weather condition, (g) other act of God, (h)inability to obtain a building permit or certificate of occupancy provided same is not directly caused by Landlord, or (i)shortage of materials or labor beyond the Landlord's control, or (j) other cause similar or dissimilar to any of the foregoing and beyond the Landlord's reasonable control. In such event, (a) the Commencement Date shall be postponed for a period equaling the length of such delay, (b) the Termination Date shall be determined pursuant to the provisions of subsection 1.1 by reference to the Commencement Date as so postponed, and (c) the Tenant shall accept possession of the Premises within three (3) days after such completion.

5.1.2.   the Tenant shall, on the date hereof, contribute to the cost of such improvements the sum of _____ Dollars ($_____).

5.1.3. the Landlord shall use its reasonable efforts to complete such improvements by the date on which the Tenant is entitled to occupy the Premises pursuant to this Lease, but shall have no liability to the Tenant hereunder if prevented from doing so by reason of any (a) strike, lock-out or other labor troubles, (b) governmental restrictions or limitations, (c) failure or shortage of electrical power, gas, water, fuel oil, or other utility or service, (d) riot, war, insurrection or other national or local emergency (e) accident, flood, fire or other casualty, (f) adverse weather condition, (g) other act of God, (h) inability to obtain a building permit or a certificate of occupancy, or (i) shortage of materials or labor, or (j) other cause similar or dissimilar to any of the foregoing and beyond the Landlord's reasonable control. In such event, (a) the Commencement Date shall be postponed for a period equaling the length of such delay, (b) the Termination Date shall be determined pursuant to the provisions of subsection 1.1 by reference to the Commencement Date as so postponed, and (c) the Tenant shall accept possession of the Premises within three (3) days after such completion.

**5.2.    By Tenant.** The Tenant shall not make any alteration, addition or improvement to the Premises without first obtaining the Landlord's written consent thereto, which consent shall not be unreasonably withheld or delayed by Landlord; provided, however, that Landlord may withhold its consent to any alterations that would, in Landlord's judgment (i) affect the structural integrity or safety of the Building ("Building Structure"), (ii) adversely affect the electrical, heating, ventilating, air conditioning, plumbing or mechanical systems of the Building ("Building Systems") or the functioning thereof, (iii) be or become visible from the exterior of the Building or from any of the common or public areas thereof, or (iv) interfere with the operation of the Building or the provision of services or utilities to or quiet enjoyment of other tenants in the Building. If Landlord consents to any alterations, Landlord may impose any conditions it reasonably deems appropriate, including, without limitation, the approval of plans and specifications, approval of all contractors and subcontractors, supervision of the work by Landlord or its agents or by Landlord's architect or contractor, and satisfactory evidence from Tenant of Tenant's ability to pay for such alterations (including, but not limited to, a payment or performance bond). Alterations shall be made at Tenant's sole expense. If Tenant elects to make approved alterations and Landlord's contractor does not perform the work, Landlord's managing agent shall be paid a construction management fee equal to five (5%) of the cost of such work. Tenant shall obtain any necessary permits and furnish copies of the permits to Landlord prior to commencement of any such work. All alterations must conform to all governmental rules and regulations, insurance requirements and the provisions of this Lease. If any mechanic's or materialman's lien is filed against the Premises, the Building or the Property for work done or materials furnished to Tenant, or claimed to have been done for or furnished to Tenant, the lien shall be released and discharged by Tenant within fifteen (15) days thereafter, solely at Tenant's expense, by paying off or bonding the lien. If any alteration is made without the prior written consent of Landlord, Landlord may correct or remove the alteration at Tenant's expense.

**5.3.    Mechanic's lien.** The Tenant shall (a) immediately after it is filed or claimed, bond or have released any mechanic's, materialman's or other lien filed or claimed against any or all of the Premises, the Property, or any other property owned or leased by the Landlord, by reason of labor or materials provided for the Tenant or any of its contractors or subcontractors (other than labor or materials provided by the Landlord pursuant to the provisions of subsection 5.1), or otherwise arising out of the Tenant's use or occupancy of the Premises or any other portion of the Property, and (b) defend, indemnify and hold harmless the Landlord against and from any and all liability, claim of liability or expense (including, by way of example rather than of limitation, that of reasonable attorneys' fees) incurred by the Landlord on account of any such lien or claim.

**5.4.    Fixtures.** Any and all improvements, repairs, alterations and all other property attached to, used in connection with or otherwise installed within the Premises by the Landlord or the Tenant shall, immediately on the completion of their installation, become the Landlord's property without payment therefor by the Landlord, except that any machinery, equipment or fixtures installed by the Tenant and used in the conduct of the Tenant's trade or business (rather than to service the Premises or any of the remainder of the Building or the Property generally) shall remain the Tenant's property.

**SECTION 6.    MAINTENANCE AND SERVICES.**

**6.1.    Ordinary services.**

6.1.1.  The Landlord shall provide the following services to or for the benefit of the Premises:

(a)  heating and air-conditioning (during respective seasons of the year in which they are necessary) for the comfortable use and occupancy of the Premises, electricity and water suitable for the use of the Premises in accordance with the provisions of Section 3, and automatic elevator service within the Building, all between 8:00 a.m. and 6:00 p.m., Monday through Friday (except for New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day), of each week during the Term; and between 9:00 a.m. and 1:00 p.m., Saturdays of each week during the Term ("Normal Building Hours"). Heating and air conditioning services outside of Normal Business Hours will be furnished at the initial rate of Sixty-Five Dollars ($65.00) per hour for each air handling unit per zone furnishing such services (subject to increase from time to time). Tenant shall give Landlord at least twenty-four (24) hours' advance notice of its need for such service outside of Normal Business Hours, and failure to provide such notice may increase the rate charged to Tenant for such service. The foregoing notwithstanding, Landlord shall endeavor to provide, 24 hours per day, 7 days per week, subject to Force Majeure, repair and maintenance and controls by local, state or federal mandates from time to time, electricity and water to the Building and the Premises, as well as at least one (1) elevator servicing the Premises, and

(b)  janitorial service and trash removal service after four o'clock p.m., Monday through Friday (except for New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day), of each week during the Term.

6.1.2.  Except as set forth above, such services shall be furnished at the Landlord's expense (subject to the operation and effect of the provisions of subsection 2.2).

6.2.    Extraordinary services.

6.2.1.  The Landlord shall not be obligated to provide to or for the benefit of the Premises any of the services referred to in the provisions of subsection 6.1 other than during the hours referred to therein. If the Landlord elects in its sole discretion to provide such services other than during such hours, and if the Tenant utilizes any of them, the Tenant shall pay to the Landlord as Additional Rent the amount from time to time charged by the Landlord therefor, as set forth on the written schedule of such charges most recently provided by the Landlord to the Tenant.

6.2.2.  The Tenant shall not, without first obtaining the Landlord's written consent thereto, install within the Premises any electrical machinery, appliances or equipment (including, by way of example rather than of limitation, any electrical heating, cooking, water-heating or refrigeration equipment, kitchen equipment, photocopying equipment, electronic data processing machinery, reproduction equipment or punch-card machinery) which either (a) uses electrical current in excess of 10 amperes at 110 volts or (b) in any way increases the amount of electricity consumed upon the Premises beyond those wattages specified herein below, and shall pay periodically as Additional Rent the additional expense incurred by the Landlord as a result thereof, including that resulting from any installation of such equipment (Landlord acknowledges that Tenant use includes the use of personal computers and related equipment for its classroom and office uses, as well as photocopying reproduction equipment and Landlord hereby consents to such installation and use). Without limiting the generality of the foregoing provisions of this paragraph, the Landlord shall have the right from time to time, using established calculation methods and/or one or more temporary or permanent sub-meters or other devices, to measure the consumption of electricity upon the Premises. The cost of such calculations and/or measuring shall be borne by the Landlord unless such measuring indicates that the electricity being consumed upon the Premises exceeds (a) for lighting, one (1) watt per square foot of floor area within the Premises, or (b) for other electrical consumption, two (2) watts per square foot of floor area within the Premises exclusive of the HVAC, in which event the Tenant shall reimburse the Landlord for the cost of such calculations and/or measuring, and shall in addition pay to the Landlord monthly, as Additional Rent, the cost incurred by the Landlord thereafter in furnishing such additional electricity to the Premises, which cost shall be estimated on a monthly basis by the Landlord using its reasonable discretion, and shall be adjusted at the end of each calendar year to reflect the actual cost of such excess electricity incurred by the Landlord during such calendar year. Tenant, at its sole cost and expense, may install

supplemental units within the Premises subject to the operation and effect of Section 7 of the attached Exhibit E.

**6.3.    Interruption.**  The Landlord shall have no liability to the Tenant for any compensation or reduction of Rent on account of any failure, modification or interruption of any such service which either (a) arises out of any of the causes enumerated in the provisions of subsection 5.1, or (b) is required by applicable law (including, by way of example rather than of limitation, any federal law or regulation relating to the furnishing or consumption of energy or the temperature of buildings).

**6.4.    Maintenance by Tenant.**  The Tenant shall maintain the nonstructural parts of the interior of the Premises in good repair and condition, ordinary wear and tear excepted.

**6.5.    Maintenance by Landlord.**  The Landlord shall furnish, supply and maintain in good order and repair (a) the roof, structure and remainder of the exterior of the Building, (b) any and all hallways, stairways, lobbies, elevators, heating and air-conditioning facilities, electrical, sanitary sewer and water lines and facilities, restroom facilities, grounds, sidewalks and parking areas (including the removal of snow from such sidewalks and parking areas), and other common areas, all if located within the Building or the rest of the Property but not within the Premises, all at the Landlord's expense except as is set forth in the provisions of Section 2 or any other provision of this Lease.

## SECTION 7.    LANDLORD'S RIGHT OF ENTRY.

The Landlord and its agents shall be entitled to enter the Premises at any reasonable time (a) to inspect the Premises, (b) to exhibit the Premises to any existing or prospective purchaser, tenant or Mortgagee thereof, (c) to make any alteration, improvement or repair to the Building or the Premises, or (d) for any other purpose relating to the operation or maintenance of the Property; provided, that the Landlord shall (a) (unless doing so is impractical or unreasonable because of emergency) give the Tenant at least twenty-four (24) hours' prior notice of its intention to enter the Premises, and (b) use reasonable efforts to avoid thereby interfering more than is reasonably necessary with the Tenant's use and enjoyment thereof.

## SECTION 8.    FIRE AND OTHER CASUALTIES.

**8.1.    General.**  Subject to Section 8.2, if the Premises are damaged by fire or other casualty during the Term:

8.1.1. the Landlord shall, with reasonable promptness (taking into account the time required by the Landlord to effect a settlement with, and to procure any insurance proceeds from, any insurer against such casualty, but in any event within one hundred eighty (180) days after the date of such casualty), substantially restore Premises to their condition immediately before such casualty, and may temporarily enter and possess any or all of the Premises for such purpose (provided, that the Landlord shall not be obligated to repair, restore or replace any fixture, improvement, alteration, furniture or other property owned, installed or made by the Tenant), but

8.1.2. the times for commencement and completion of any such restoration shall be extended for the period of any delay occasioned by the Landlord in doing so arising out of any of the causes enumerated in the provisions of subsection 5.1.  If the Landlord undertakes to restore the Premises and such restoration is not accomplished within the said period of one hundred eighty (180) days plus the period of any extension thereof, as aforesaid, the Tenant may terminate this Lease by giving written notice thereof to the Landlord within thirty (30) days after the expiration of such period, as so extended; and

8.1.3. so long as the Tenant is deprived of the use of any or all of the Premises on account of such casualty, the Base Rent and any Additional Rent payable under the provisions of subsection 2.2 shall be abated in proportion to the number of square feet of the Premises rendered substantially unfit for occupancy by such casualty, unless, because of any such damage, the undamaged portion of the Premises is made materially unsuitable for use by the Tenant for the purposes set forth in the provisions of Section 3, in which event the Base Rent and any such Additional Rent shall be abated entirely during such period of deprivation.

8.2.    **Substantial destruction.** Anything contained in the foregoing provisions of this Section to the contrary notwithstanding:

8.2.1. if during the Term the Building is so damaged by fire or other casualty that (a) either the Premises or (whether or not the Premises are damaged) the Building is rendered substantially unfit for occupancy, as reasonably determined by the Landlord, or (b) the Building is damaged to the extent that the Landlord reasonably elects to demolish the Building, or if any Mortgagee requires that any or all of such insurance proceeds be used to retire any or all of the debt secured by its Mortgage, then in any such case the Landlord may elect to terminate this Lease as of the date of such casualty by giving written notice thereof to the Tenant within thirty (30) days as of the date of such casualty; and

8.2.2. in such event, (a) the Tenant shall pay to the Landlord the Base Rent and any Additional Rent payable by the Tenant hereunder and accrued through the date of such termination, (b) the Landlord shall repay to the Tenant any and all prepaid Rent for periods beyond such termination as well as Tenant's security deposit as provided for in Section 2.6. hereof, and (c) the Landlord may enter upon and repossess the Premises without further notice.

8.3.    **Intentionally Omitted.**

**SECTION 9.    CONDEMNATION.**

9.1.    **Right to Award.**

9.1.1. If any or all of the Premises are taken by the exercise of any power of eminent domain or are conveyed to or at the direction of any governmental entity under a threat of any such taking (each of which is hereinafter referred to as a "Condemnation"), the Landlord shall be entitled to collect from the condemning authority thereunder the entire amount of any award made in any such proceeding or as consideration for such conveyance, without deduction therefrom for any leasehold or other estate held by the Tenant under this Lease.

9.1.2. The Tenant hereby (a) assigns to the Landlord all of the Tenant's right, title and interest, if any, in and to any such award; (b) waives any right which it may otherwise have in connection with such Condemnation, against the Landlord or such condemning authority, to any payment for (i) the value of the then-unexpired portion of the Term, (ii) leasehold damages, and (iii) any damage to or diminution of the value of the Tenant's leasehold interest hereunder or any portion of the Premises not covered by such Condemnation; and (c) agrees to execute any and all further documents which may be required to facilitate the Landlord's collection of any and all such awards.

9.1.3. Subject to the operation and effect of the foregoing provisions of this Section, the Tenant may seek, in a separate proceeding, a separate award on account of any damages or costs incurred by the Tenant as a result of such Condemnation, so long as such separate award in no way diminishes any award or payment which the Landlord would otherwise receive as a result of such Condemnation.

9.2.    **Effect of Condemnation.**

9.2.1. If (a) all of the Premises are covered by a Condemnation, or (b) any part of the Premises is covered by a Condemnation and the remainder thereof is insufficient for the reasonable operation therein of the Tenant's business, or (c) any of the Building is covered by a Condemnation and, in the Landlord's reasonable opinion, it would be impractical to restore the remainder thereof, or (d) any of the rest of the Property is covered by a Condemnation and, in the Landlord's reasonable opinion, it would be impractical to continue to operate the remainder of the Property thereafter, then, in any such event, the Term shall terminate on the date on which possession of so much of the Premises, the Building or the rest of the Property, as the case may be, as is covered by such Condemnation is taken by the condemning authority thereunder, and all Rent (including, by way of example rather than of limitation, any Additional Rent payable under the provision of subsection 2.2), taxes and other charges payable hereunder shall be apportioned and paid to such date.

9.2.2. If there is a Condemnation and the Term does not terminate pursuant to the foregoing provision of this subsection, the operation and effect of this Lease shall be unaffected by

such Condemnation, except that the Base Rent shall be reduced in proportion to the square footage of floor area, if any, of the Premises covered by such Condemnation.

9.3.    If there is a Condemnation, the Landlord shall have no liability to the Tenant on account of any (a) interruption of the Tenant's business upon the Premises, (b) diminution in the Tenant's ability to use the Premises, or (c) other injury or damage sustained by the Tenant as a result of such Condemnation.

9.4.    Except for any separate proceeding brought by the Tenant under the provisions of paragraph 9.1.3., the Landlord shall be entitled to conduct any such condemnation proceeding and any settlement thereof free of interference from the Tenant, and the Tenant hereby waives any right which it otherwise has to participate therein.

## SECTION 10.  ASSIGNMENT AND SUBLETTING.

10.1.    The Tenant hereby acknowledges that the Landlord has entered into this Lease because of the Tenant's financial strength, goodwill, ability and expertise and that, accordingly, this Lease is one which is personal to the Tenant, and agrees for itself and its successors and assigns in interest hereunder that it will not (a) assign any of its rights under this Lease, or (b) make or permit any total or partial sale, lease, sublease, assignment, conveyance, license, mortgage, pledge, encumbrance or other transfer of any or all of the Premises or the occupancy or use thereof (each of which is hereinafter referred to as a "Transfer"), without first obtaining the Landlord's written consent thereto (which consent may be given or withheld in the Landlord's sole discretion and, if given, shall not constitute a consent to any subsequent such Transfer, whether by the person herein above named as the "Tenant" or by any such transferee). The Landlord shall be entitled, at its sole discretion, to condition any such consent upon the entry by such person into an agreement with (and in form and substance satisfactory to) the Landlord, by which it assumes all of the Tenant's obligations hereunder. Any person to whom any Transfer is attempted without such consent shall have no claim, right or remedy whatsoever hereunder against the Landlord, and the Landlord shall have no duty to recognize any person claiming under or through the same. No such action taken with or without the Landlord's consent shall in any way relieve or release the Tenant from liability for the timely performance of all of the Tenant's obligations hereunder. The Tenant hereby acknowledges that any merger, consolidation or other restructuring of ownership interests in Tenant constitutes a Transfer hereunder. As additional rent, Tenant shall reimburse Landlord promptly for reasonable legal and other expenses incurred by Landlord in connection with any request by Tenant for consent to assignment or subletting; no assignment or subletting shall affect the continuing primary liability of Tenant (which, following assignment, shall be joint and several with the assignee); no consent to any of the foregoing in a specific instance shall operate as a waiver in any subsequent instance. In the event that any assignee or subtenant pays to tenant any amounts in excess of the Annual Rent and Additional Rent then payable hereunder, or pro rata portion thereof on a square footage basis for any portion of the Premises, Tenant shall promptly pay fifty percent (50%) said excess, less reasonable expenses directly incurred by Tenant, to Landlord as and when received by Tenant.

The preceding paragraph notwithstanding, it shall not be considered a Transfer and Landlord's consent shall not be required in the event a portion of the Premises is used and or occupied by and affiliate or an entity under common control with Tenant, provided such use and occupancy is (i) temporary in nature and (ii) does not constitute in excess of forty percent (40%) of the Premises, in the aggregate. It is specifically understood that Tenant shall remain primarily liable under the terms of the Lease.

10.2.    Anything contained in the foregoing provisions of this Section to the contrary notwithstanding, neither the Tenant nor any other person having an interest in the possession, use or occupancy of the Premises or any other portion of the Property shall enter into any lease, sublease, license, concession or other agreement for the possession, use or occupancy of space in the Premises or any other portion of the Property which provides for any rental or other payment for such use, occupancy or utilization based in whole or in part upon the net income or profits derived by any person from the space in the Premises or other portion of the Property so leased, used or occupied (other than any amount based on a fixed percentages of receipts or sales).

10.3.    In the event of any Transfer with or without Landlord's consent, Landlord may, at its sole option, have the right at any time or from time to time after such Transfer to terminate this

Lease as to all or any portion of the Premises and enter into a direct lease agreement with the proposed sublessee. Neither Tenant nor any party claiming an interest under or through Tenant shall interfere with Landlord's exercise of its rights hereunder. Tenant hereby indemnifies and holds Landlord harmless from and against any and all liabilities, costs, losses or damages, including reasonable attorneys fees and court costs, arising from any breach of the provisions of this section by Tenant.

## SECTION 11.  RULES AND REGULATIONS.

The Landlord shall have the right to prescribe, at its sole discretion, reasonable rules and regulations (hereinafter referred to as the "Rules and Regulations") having uniform applicability to all tenants of the Building (subject to the provisions of their respective leases) and governing their use and enjoyment of the Building and the remainder of the Property; provided, that the Rules and Regulations shall not materially interfere with the Tenant's use and enjoyment of the Premises, in accordance with the provisions of this Lease, for the purposes enumerated in the provisions of Section 3.  The Tenant shall adhere to the Rules and Regulations and shall cause its agents, employees, invitees, visitors and guests to do so.  A copy of the Rules and Regulations in effect on the date hereof is attached hereto as Exhibit C.

## SECTION 12.  SUBORDINATION; ATTORNMENT AND NON-DISTURBANCE.

**12.1.    Subordination.** This Lease shall be subject and subordinate to the lien, operation and effect of each mortgage, deed of trust, ground lease or other, similar instrument of encumbrance heretofore or hereafter covering any or all of the Premises or the remainder of the Property (and each renewal, modification, consolidation, replacement or extension thereof), (each of which is herein referred to as a "Mortgage"), all automatically and without the necessity of any action by either party hereto.

**12.2.    Attornment and non-disturbance.** The Tenant shall, promptly at the request of the Landlord or the holder of any Mortgage (herein referred to as a "Mortgagee"), execute, enseal, acknowledge and deliver such further instrument or instruments:

12.2.1. evidencing such subordination as the Landlord or such Mortgagee deems necessary or desirable, and

12.2.2. (at such Mortgagee's request) attorning to such Mortgagee.  Landlord will use its reasonable efforts to obtain an agreement from the Mortgagee (in such Mortgagee's usual form) that such Mortgagee will, in the event of a foreclosure of any such mortgage or deed of trust (or termination of any such ground lease) take no action to interfere with the Tenant's rights hereunder, except on the occurrence of an Event of Default.

**12.3.** Anything contained in the provisions of this Section to the contrary notwithstanding, any Mortgagee may at any time subordinate the lien of its Mortgage to the operation and effect of this Lease without obtaining the Tenant's consent thereto, by giving the Tenant written notice thereof, in which event this Lease shall be deemed to be senior to such Mortgage without regard to their respective dates of execution, delivery and/or recordation among the Land Records of the said County, and thereafter such Mortgagee shall have the same rights as to this Lease as it would have had, were this Lease executed and delivered before the execution of such Mortgage.

## SECTION 13.  DEFAULT.

**13.1.    Definition:** As used in the provisions of this Lease, each of the following events shall constitute, and is hereinafter referred to as, an "Event of Default":

13.1.1. If the Tenant fails to (a) pay any Rent or any other sum which it is obligated to pay by any provision of this Lease, when and as due and payable hereunder and without demand therefor, or (b) perform any of its other obligations under the provisions of this Lease; or

13.1.2. If the Tenant (a) applies for or consents to the appointment of a receiver, trustee or liquidator of the Tenant or of all or a substantial part of its assets, (b) files a voluntary petition in bankruptcy or admits in writing its inability to pay its debts as they come due, (c) makes an assignment for the benefit of its creditors, (d) files a petition or an answer seeking a

reorganization or an arrangement with creditors, or seeks to take advantage of any insolvency law, (e) performs any other act of bankruptcy, or (f) files an answer admitting the material allegations of a petition filed against the Tenant in any bankruptcy, reorganization or insolvency proceeding; or

13.1.3.  if (a) an order, judgment or decree is entered by any court of competent jurisdiction adjudicating the Tenant a bankrupt or an insolvent, approving a petition seeking such a reorganization, or appointing a receiver, trustee or liquidator of the Tenant or of all or a substantial part of its assets, or (b) there otherwise commences as to the Tenant or any of its assets any proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment, receivership or similar law, and if such order, judgment, decree or proceeding continues unstayed for more than sixty (60) consecutive days after any stay thereof expires;

13.1.4.  If the Tenant fails to occupy and assume possession of the Premises within fifteen (15) days after the Commencement Date;

13.1.5.  If the Tenant generally fails to pay its debts as they become due; or

13.1.6.  If the Tenant vacates or abandons the Premises, whether or not Rent or other sums are due and unpaid hereunder.

**13.2.  Notice to Tenant; grace period.**  Anything contained in the provisions of this Section to the contrary notwithstanding, on the occurrence of an Event of Default the Landlord shall not exercise any right or remedy which it holds under any provision of this Lease or applicable law unless and until:

13.2.1.  The Landlord has given written notice thereof to the Tenant, if written notice is required by this Section for the Event of Default which has occurred, and

13.2.2.  the Tenant has failed, (a) if such Event of Default consists of a failure to pay money, within five (5) days of the date of such notice, to pay such money, or (b) if such Event of Default consists of something other than a failure to pay money, within ten (10) days after the date of such notice, to actively, diligently, continuously and in good faith endeavor to cure such Event of Default and to continue thereafter to do so until it is fully cured (provided that such failure must be remedied within forty-five (45) days of such notice); provided, that

13.2.3.  no such notice shall be required, and the Tenant shall be entitled to no such grace period, (a) in an emergency situation in which the Landlord acts to cure such Event of Default pursuant to the provisions of paragraph 13.3.5; or (b) the Tenant commits an Event of Default (whether it be a default of the same provision of the Lease or of different provisions) more than twice during any twelve (12) month period, or (c) if the Tenant has substantially terminated or is in the process of substantially terminating its continuous occupancy and use of the Premises for the purpose set forth in the provisions of Section 3, or (d) in the case of any Event of Default enumerated in the provisions of paragraphs 13.1.2., 13.1.3. and 13.1.6.

**13.3.  Landlord's rights on Event of Default.**  On the occurrence of any Event of Default, the Landlord may (subject to the operation and effect of the provisions of subsection 13.2) take any or all of the following actions:

13.3.1.  re-enter and repossess the Premises and any and all improvements thereon and additions thereto;

13.3.2.  declare the entire balance of the Rent for the remainder of the Term to be due and payable, and collect such balance in any manner not inconsistent with applicable law;

13.3.3.  terminate this Lease;

13.3.4.  relet any or all of the Premises for the Tenant's account for any or all of the remainder of the Term as herein above defined, or for a period exceeding such remainder, in which event the Tenant shall pay to the Landlord, at the times and in the manner specified by the provisions of Section 2, the Base Rent and any Additional Rent accruing during such remainder, less any monies received by the Landlord, with respect to such remainder, from such reletting, as well as the cost to the Landlord of any attorneys' fees or of any repairs or other action (including those taken in

exercising the Landlord's rights under any provision of this Lease) taken by the Landlord on account of such Event of Default;

13.3.5. cure such Event of Default in any other manner (after giving the Tenant written notice of the Landlord's intention to do so except as provided in paragraph 13.2.3), in which event the Tenant shall reimburse the Landlord for all expenses incurred by the Landlord in doing so, plus interest thereon at the lesser of the rate of eighteen percent (18%) per annum which expenses and interest shall be Additional Rent and shall be payable by the Tenant immediately on demand therefor by the Landlord; and/or

13.3.6. pursue any combination of such remedies and/or any other remedy available to the Landlord on account of such Event of Default under applicable law.

**13.4.  No waiver.**  No action taken by the Landlord under the provisions of this Section shall operate as a waiver of any right which the Landlord would otherwise have against the Tenant for the Rent hereby reserved or otherwise, and the Tenant shall remain responsible to the Landlord for any loss and/or damage suffered by the Landlord by reason of any Event of Default.

**13.5.  Default by Landlord.**  In the event of any default by Landlord, Tenant's exclusive remedy shall be an action for actual direct damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon Rent due Landlord or any right of set-off against Rent), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such default.  Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof.  All obligations of Landlord hereunder will be construed as covenants, not conditions, and all such obligations will be binding upon Landlord only during the period of its ownership of the Building and the Property and not thereafter.  The term "Landlord" shall mean only the then-current owner of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all covenants and obligations of the Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.  Notwithstanding any other provision hereof, no partner, shareholder, member, officer, director, employee or agent of Landlord or of any partner, shareholder or member in Landlord shall have any personal liability hereunder.  In the event of any breach or default by Landlord in any term or provision of this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the Property, however, in no event, shall any deficiency judgment or any money judgment of any kind be sought or obtained against any Landlord.

## SECTION 14.  ESTOPPEL CERTIFICATE.

The Tenant shall from time to time, within five (5) days after being requested to do so by the Landlord or any Mortgagee, execute, enseal, acknowledge and deliver to the Landlord (or, at the Landlord's request, to any existing or prospective purchaser, transferee, assignee or Mortgagee of any or all of the Premises, the Property, any interest therein or any of the Landlord's rights under this Lease) an instrument in recordable form,

14.1.  certifying (a) that this Lease is unmodified and in full force and effect (or, if there has been any modification thereof, that it is in full force and effect as so modified, stating therein the nature of such modification); (b) as to the dates to which the Base Rent and any Additional Rent and other charges arising hereunder have been paid; (c) as to the amount of any prepaid Rent or any credit due to the Tenant hereunder; (d) that the Tenant has accepted possession of the Premises, and the date on which the Term commenced; (e) as to whether, to the best knowledge, information and belief of the signer of such certificate, the Landlord or the Tenant is then in default in performing any of its obligations hereunder (and, if so, specifying the nature of each such default); and (f) as to any other fact or condition reasonably requested by the Landlord or such other addressee; and

14.2.  acknowledging and agreeing that any statement contained in such certificate may be relied upon by the Landlord and any such other addressee.

14.3.  In the event that Tenant fails to deliver in a timely manner the estoppel certificate described in Section 14, Landlord may complete such a certificate on behalf of Tenant, which certificate shall be binding against Tenant as if Tenant itself signed such certificate.  For such

purpose, Tenant hereby irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact (which appointment shall be deemed coupled with an interest) for and in its name to prepare and sign on Tenant's behalf such an estoppel certificate, Tenant hereby ratifying and confirming all the said attorney shall lawfully do or choose to do or be done by virtue hereof, it being understood and agreed that the aforesaid provisions impose no burden or obligation on the Landlord to do or perform any act whatsoever. After said estoppel certificate has been prepared by Landlord, Landlord shall provide Tenant a copy thereof. Unless Tenant modifies such certificate as may be appropriate to make the certificate fully accurate, and signs and returns to Landlord the certificate within three (3) days after receipt from Landlord, Landlord shall be entitled and authorized to sign such estoppel certificate and deliver to any Mortgagee or other person such estoppel certificate in the name and on behalf of Tenant.

## SECTION 15.  QUIET ENJOYMENT.

The Landlord hereby covenants that the Tenant, on paying the Rent and performing the covenants set forth herein, shall peaceably and quietly hold and enjoy, throughout the Term, (a) the Premises, and (b) such rights as the Tenant may hold hereunder with respect to the remainder of the Property, without interruption or disturbance from Landlord, or anyone claiming through or under Landlord, subject to the terms of this Lease.

## SECTION 16.  NOTICES.

Any notice, demand, consent, approval, request or other communication or document to be provided hereunder to a party hereto shall be (a) given in writing, and (b) deemed to have been given forty-eight (48) hours after being sent as certified or registered mail in the United States mails, postage prepaid, return receipt requested, upon its hand delivery to such party or by overnight delivery, as addressed as follows:

|  |  |
|---|---|
| If to the Landlord: | Attn: 1627 K Associates Limited Partnership<br>c/o Cambridge Asset Advisors Limited Partnership<br>560 Herndon Parkway, Suite 210<br>Herndon, Virginia  20170 |
| If to Tenant: | Attn:Marie V. Nasuti, Esq.<br>Harrison Career Group<br>Plaza 1000 Main Street, Suite 310<br>Voorhees, New Jersey  08043 |

Each party may change its notice address by giving written notice of such change to the other party in accordance with the terms of this Section 16.

## SECTION 17.  LANDLORD'S LIEN.

In addition to any statutory lien for Rent in Landlord's favor, Landlord shall have and Tenant hereby grants to Landlord a continuing security interest for all Rent and other sums of money becoming due hereunder from Tenant, upon all goods, equipment, fixtures, furniture, inventory, and other personal property of Tenant situated on the Premises subject to this Lease and such property shall not be removed therefrom without the consent of Landlord until all arrearages in Rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged. Products of the collateral listed above are also covered. In the event of a default under this Lease, Landlord shall have, in addition to any other remedies provided herein or by law, all rights and remedies under the Uniform Commercial Code, including without limitation the right to sell the property described in this Section at public or private sale upon thirty (30) days' notice to Tenant. Tenant hereby agrees to execute such other instruments necessary or desirable in Landlord's discretion to perfect the security interests hereby granted. Landlord and Tenant agree that this Lease and Security Agreement serves as a financing statement and that a copy of photographic or other reproduction of this portion of the Lease may be filed of record by Landlord and have the same force and effect as the original. This Security Agreement and Financing Statement also covers fixtures located at the Premises and may be filed for record in the land records. The record owner of the Property is **1627 K ASSOCIATES LIMITED PARTNERSHIP**. Tenant hereby warrants and represents that the collateral subject to the security interest granted by this Section is not purchased or used by Tenant for personal, family or household purposes.

## SECTION 18.  GENERAL.

**18.1.  Effectiveness.** This Lease shall become effective upon and only upon its execution by each party hereto.

**18.2.  Complete understanding.**  This Lease represents the complete understanding between the parties hereto as to the subject matter hereof, and supersedes all prior written or oral negotiations, representations, warranties, statements or agreements between the parties hereto as to the same.

**18.3.  Amendment.** This Lease may be amended by and only by an instrument executed and delivered by each party hereto.

**18.4.  Applicable law.** This Lease shall be given effect and construed by application of the laws of the District of Columbia, and any action or proceeding arising hereunder shall be brought in the Superior Court for District of Columbia; provided, that if such action or proceeding arises under the Constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties thereto so that it is to be brought in a United States District Court, it shall be brought in the United States District court for the District of Columbia.

**18.5.  Waiver.** The Landlord shall not be deemed to have waived the exercise of any right which it holds hereunder unless such waiver is made expressly and in writing (and no delay or omission by the Landlord in exercising any such right shall be deemed to be a waiver of its future exercise).  No such waiver as to any instance involving the exercise of any such right shall be deemed a waiver as to any other such instance, or any other such right.

**18.6.  Time of essence.** Time shall be of the essence of this Lease.

**18.7.  Headings.** The headings of the Sections, subsections, paragraphs and subparagraphs hereof are provided herein for and only for convenience of reference, and shall not be considered in construing their contents.

**18.8.  Construction.** As used herein:

**18.8.1.** the term "person" means a natural person, a trustee, a corporation, a partnership and any other form of legal entity; and

**18.8.2.** all references made (a) in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, (b) in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well, and (c) to any Section, subsection, paragraph or subparagraph shall, unless therein expressly indicated to the contrary, be deemed to have been made to such Section, subsection, paragraph or subparagraph of this Lease.

**18.9.  Exhibits.** Each writing referred to herein as being attached hereto as an exhibit or otherwise designated herein as an exhibit hereto is hereby made a part hereof.

**18.10.  Severability.** No determination by any court, governmental body or otherwise that any provision of this Lease or any amendment hereof is invalid or unenforceable in any instance shall affect the validity or enforceability of (a) any other such provision, or (b) such provision in any circumstance not controlled by such determination.  Each such provision shall be valid and enforceable to the fullest extent allowed by, and shall be construed wherever possible as being consistent with, applicable law.

**18.11.  Definition of the "Landlord".**

**18.11.1.** As used herein, the term the "Landlord" means the person herein above named as such, and its heirs, personal representatives, successors and assigns (each of whom shall have the same rights, remedies, powers, authorities and privileges as it would have had, had it originally signed this lease as the Landlord).

**18.11.2.** No person holding the Landlord's interest hereunder (whether or not such person is named as the "Landlord" herein) shall have any liability hereunder after such person ceases

to hold such interest, except for any such liability accruing while such person holds such interest, provided the successor Landlord has assumed the obligations of Landlord hereunder.

18.11.3. No partner, shareholder, member, officer, director, employee or agent of Landlord, or of any partner, shareholder or member in Landlord, whether disclosed or undisclosed, shall have any personal liability under any provision of this Lease.

**18.12. Definition of the "Tenant".** As used herein, the term the "Tenant" means each person herein above named as such and such person's heirs, personal representatives, successors and assigns, each of whom shall have the same obligations, liabilities, rights and privileges as it would have possessed had it originally executed this Lease as the Tenant; provided, that no such right or privilege shall inure to the benefit of any assignee of the Tenant, immediate or remote, unless the assignment to such assignee is made in accordance with the provisions of Section 10. Whenever two or more persons constitute the Tenant, all such persons shall be jointly and severally liable for performing the Tenant's obligations hereunder. No partner, shareholder, member, officer, director, employee or agent of Tenant, or of any partner, shareholder or member in Tenant, whether disclosed or undisclosed, shall have any personal liability under any provision of this Lease

**18.13. Commissions.** Each party hereto hereby represents and warrants to the other that, in connection with the leasing of the Premises hereunder, the party so representing and warranting has not dealt with any real estate broker, agent or finder, other than Cambridge Property Group Limited Partnership representing Landlord and CB Richard Ellis, representing Tenant, and there is no other commission, charge or other compensation due on account thereof. Each party hereto shall indemnify and hold harmless the other against and from any inaccuracy in such party's representation.

**18.14. Recordation.** This Lease may not be recorded among the Land Records of the said County or among any other public records, without the Landlord's prior express, written consent thereto, and any attempt by the Tenant to do so without having obtained the Landlord's consent thereto shall constitute an Event of Default hereunder. If this Lease is recorded by either party hereto, such party shall bear the full expense of any transfer, documentary stamp or other tax, and any recording fee, assessed in connection with such recordation; provided, that if under applicable law the recordation of this Lease hereafter becomes necessary in order for this Lease to be or remain effective, the Tenant shall bear the full expense of any and all such taxes and fees incurred in connection therewith.

**18.15. Tenant's Declaration.** Tenant is not the subject of (i) any petition under any Chapter of the Bankruptcy Code, Title 11, United States Code (the "Bankruptcy Code"), and has no intent to seek relief, protection, reorganization, liquidation, dissolution or similar relief from debtors under any local, state, federal or other insolvency laws or laws providing for relief of debtors, or in equity, or directly or indirectly to cause any of them to file any such petition or to seek any such relief, either at the present time or at any time hereafter; or (ii) any actions, suits or proceedings pending or threatened against Tenant or involving Tenant's business that could have a material adverse effect on Tenant's ability to perform its obligations pursuant to this Lease.

**18.16. Waiver of Trial by Jury.** The Tenant hereby waives trial by jury in any action or proceeding to which the Tenant and the Landlord may be parties, arising out of or in any way pertaining to (a) this Lease, or (b) the Property. It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against parties who are not parties to this Lease.

This waiver is knowingly, willingly and voluntarily made by the Tenant, and the Tenant hereby represents that no representations of fact or opinion have been made by any individual to induce this waiver of trial by jury or to in any way modify or nullify its effect. The Tenant hereby represents that it has been represented in the signing of this Lease and in the making of this waiver by independent legal counsel, selected of its own free will, and that it has had the opportunity to discuss this waiver with counsel.

**18.17. Approval by Mortgagees.** Anything contained in the provisions of this Lease to the contrary notwithstanding, the Landlord shall be entitled at any time hereafter but before the Landlord delivers possession of the Premises to the Tenant hereunder, to terminate this Lease by giving

written notice thereof to the Tenant, if any Mortgagee fails to approve this Lease for purposes of the provisions of its Mortgage, and in the manner set forth therein.

**18.18. Required Changes in Lease by Lenders.** In the event that any lender providing construction or permanent financing or any refinancing for the Building requires, as a condition of such financing, that modifications to this Lease be obtained; and provided that such modifications (i) are reasonable; (ii) do not adversely affect Tenant's use of the Leased Premises as herein permitted or the leasehold interest hereby created; (iii) do not increase the base rent, operating rent and other sums to be paid by Tenant hereunder; and (iv) do not affect the Term, the location of or access to the Leased Premises, signage, parking or sublease and assignment provisions, then Landlord may submit to Tenant a written amendment to this Lease incorporating such required written changes, and Tenant hereby covenants and agrees to execute, acknowledge and deliver such amendment to Landlord within five (5) days of Tenant's receipt thereof.

**18.19. Financial Information.** At Landlord's request, Tenant shall deliver certified copies of Tenant's most recent and historical financial statements. Such statements shall include Balance Sheets, Income and Expense Statements as well as any other supporting documents required by Landlord or any person or institution providing financing to the Property or relating to the Property.

**18.20. Authority.** The person executing and delivering this Lease on behalf of Landlord represents and warrants that he has full power, authority and right to do so pursuant to the ownership and of Landlord. The person executing and delivering this Lease on behalf of Tenant represents and warrants that he has full power, authority and right to do so on behalf of Tenant.

**SIGNATURES ON FOLLOWING PAGE**

**IN WITNESS WHEREOF,** each party hereto has executed and ensealed this Lease or caused it to be executed and ensealed on its behalf by its duly authorized representatives, the day and year first above written.

**WITNESS:**

**THE LANDLORD:   1627 K ASSOCIATES LIMITED PARTNERSHIP**

By: 1627 K Street, Inc., its general partner

By:     T. Michael Scott
         Vice President

**WITNESS:**

**THE TENANT:     HARRISON CAREER INSTITUTE**

By:

Name:

Title:     PRESIDENT

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT A

PREMISES

The Premises shall initially consist of approximately 1,800 rentable square feet and effective the Phase II Commencement Date, the Premises shall consist of approximately 9,915 rentable square feet in 1627 K Street, a 64,153 square foot office project located at 1627 K Street, N.W., Washington DC; (and the Premises) to be located in the approximate location shown on the plan attached hereto as Exhibit A-1.

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT A-1


SITE PLAN


INTENTAIONALLY OMITTED

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B

PLANS AND SPECIFICATIONS FOR THE PREMISES

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-1 (a)

SPACE PLAN

Ninth (9th) Floor



AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-1 (b)

SPACE PLAN

Tenth (10th) Floor



AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-2

SPACE PLAN

Initial Premises

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT C

## CURRENT RULES AND REGULATIONS

1. The sidewalks, lobbies, passages, elevators and stairways shall not be obstructed by the Tenant and used by the Tenant for any purposes other than ingress and egress from and to the Tenant's offices. The Landlord shall in all cases retain the right to control or prevent access thereto by any person whose presence, in the Landlord's judgment, would be prejudicial to the safety, peace, character or reputation of the Building or of any tenant of the Property.

2. The toilet rooms, water closets, sinks, faucets, plumbing and other service apparatus of any kind shall not be used by the Tenant for any purpose other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith by the Tenant, or left by the Tenant in the lobbies, passages, elevators or stairways of the Building.

3. No skylight, window, door or transom of the Building shall be covered or obstructed by the Tenant, and no window shade, blind, curtain, screen, storm window, awning or other material shall be installed or placed on any window or in any window space, except as approved in writing by the Landlord. If the Landlord has installed or hereafter installs any shade, blind or curtain in the Premises, the Tenant shall not remove it without first obtaining the Landlord's written consent thereto.

4. No sign, lettering, insignia, advertisement, notice or other thing shall be inscribed, painted, installed, erected or placed in any portion of the Premises which may be seen from outside the Building, or on any window, window space or other part of the exterior or interior of the Building, unless first approved in writing by the Landlord. Names on suite entrances shall be provided by and only by the Landlord and at the Tenant's expense, using in each instance lettering of a design and in a form consistent with the other lettering in the Building, and first approved in writing by the Landlord. The Tenant shall/will not erect any stand, booth or showcase or other article or matter in or upon the Premises and/or the Building without first obtaining the Landlord's written consent thereto.

5. The Tenant shall not place any additional lock upon any door within the Premises or elsewhere upon the Property, and shall surrender all keys for all such locks at the end of the Term. The Landlord shall provide the Tenant with one set of keys to the Premises when the Tenant assumes possession thereof.

6. The delivery of towels, ice, water, food, beverages, newspaper and other supplies, equipment and furniture will be permitted only under the Landlord's direction and control.

7. The Tenant shall not do or permit to be done anything which obstructs or interferes with the rights of any other tenant of the Property. The Tenant shall not keep anywhere within the Property any matter having an offensive odor, or any kerosene, gasoline, benzine, camphene, fuel or other explosive or highly flammable material. No bird, fish or other animal shall be brought into or kept in or about the Premises.

EXHIBIT C - CURRENT RULES AND REGULATIONS
PAGE TWO (2)

8. So that the Premises may be kept in a good state of preservation and cleanliness, the Tenant shall, while in possession of the Premises, permit only the Landlord's employees and contractors to clean the Premises unless prior thereto the Landlord otherwise consents in writing. The Landlord shall not be responsible to the Tenant for any damage done to any furniture or other property of the Tenant or any other person caused by any of the Landlord's employees or any other person, for any loss sustained by any of the Tenant's employees, or for any loss of property of any kind in or from the Premises, however occurring. The Tenant shall see each day that the windows are closed and the doors securely locked before leaving the Premises, and that all lights and standard office equipment within the Premises are turned off.

9. If the Tenant desires to install signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices within the Premises, the Landlord shall direct where and how they are to be installed and, except as so directed, no installation, boring or cutting shall be permitted. The Landlord shall have the right (a) to prevent or interrupt the transmission of excessive, dangerous or annoying current of electricity or otherwise into or through the Building or the Premises, (b) to require the changing of wiring connections or layout at the Tenant's expense, to the extent that the Landlord may deem necessary, (c) to require compliance with such reasonable rules as the Landlord may establish relating thereto, and (d) in the event of noncompliance with such requirements or rules, immediately to cut wiring or do whatever else it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. Each wire installed by the Tenant must be clearly tagged at each distributing board and junction box and elsewhere where required by Landlord, with the number of the office to which such wire leads and the purpose for which it is used, together with the name of the tenant or other concern, if any, operating or using it.

10. A directory will be provided by the Landlord on the ground floor of the Building, on which the Tenant's name may be placed.

11. No furniture, package, equipment, supplies or merchandise may be received in the Building, or carried up or down in the elevators or stairways, except during such hours as are designated for such purpose by the Landlord, and only after Tenant gives notice thereof to the Landlord. The Landlord shall have the exclusive right to prescribe the method and manner in which any of the same is brought into or taken out of the Building, and the right to exclude from the Building any heavy furniture, safe or other article which may create a hazard and to require it to be located at a designated place in the Premises. The Tenant shall not place any weight anywhere beyond the safe carrying capacity of the Building. The cost of repairing any damage to the Building or any other part of the Property caused by taking any of the same in or out of the Premises, or any damage caused while it is in the Premises or the rest of the Building, shall be borne by the Tenant.

12. Without the Landlord's prior written consent, (a) nothing shall be fastened to (and no hole shall be drilled, or nail or screw driven into) any wall or partition, (b) no wall, or partition shall be painted, papered or otherwise covered or moved in any way or marked or broken, (c) no connection shall be made to any electrical wire for running any fan, motor or other apparatus, device or equipment, (d) no machinery of any kind other than customary small business machinery shall be allowed in the Premises, (e) no switchboard or telephone wiring or equipment shall be placed anywhere other than where designated by the Landlord, and (f) no mechanic shall be allowed to work in or about the Building other than one employed by the Landlord, unless approved in writing by Landlord.

13. The Tenant shall have access to the Premises at all reasonable times. The Landlord shall in no event be responsible for admitting or excluding any person from the Premises. In case of invasion, hostile attack, insurrection, mob violence, riot, public excitement or other commotion, explosion, fire or any casualty, the Landlord shall have the right to bar or limit access to the Building to protect the safety of occupants of the Property, or any property within the Property.

EXHIBIT C - CURRENT RULES AND REGULATIONS
PAGE THREE (3)

14. The Landlord shall have the right to rescind, suspend or modify the Rules and Regulations and to promulgate such other Rules or Regulations as, in the Landlord's reasonable judgment, are from time to time needed for the safety, care, maintenance, operation and cleanliness of the Building, or for the preservation of good order therein. Upon the Tenant's having been given notice of the taking of any such action, the Rules and Regulations as so rescinded, suspended, modified or promulgated shall have the same force and effect as if in effect at the time at which the Tenant's lease was entered into (except that nothing in the Rules and Regulations shall be deemed in any way to alter or impair any provision of such lease).

15. The use of any room within the Building as sleeping quarters is strictly prohibited at all times.

16. The Tenant shall keep the windows and doors of the Premises (including those opening on corridors and all doors between rooms entitled to receive heating or air conditioning service and rooms not entitled to receive such service), closed while the heating or air conditioning system is operating, in order to minimize the energy used by, and to conserve the effectiveness of, such systems. The Tenant shall comply with all reasonable Rules and Regulations from time to time promulgated by the Landlord with respect to such systems or their use.

17. Nothing in these Rules and Regulations shall give any Tenant any right or claim against the Landlord or any other person if the Landlord does not enforce any of them against any other tenant or person (whether or not the Landlord has the right to enforce them against such tenant or person), and no such nonenforcement with respect to any tenant shall constitute a waiver of the right to enforce them as to the Tenant or any other tenant or person.

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-1 (a)

SPACE PLAN

Ninth (9th) Floor

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-1 (b)

SPACE PLAN

Tenth (10th) Floor

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-2

SPACE PLAN

Initial Premises



AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT C

## CURRENT RULES AND REGULATIONS

1. The sidewalks, lobbies, passages, elevators and stairways shall not be obstructed by the Tenant and used by the Tenant for any purposes other than ingress and egress from and to the Tenant's offices. The Landlord shall in all cases retain the right to control or prevent access thereto by any person whose presence, in the Landlord's judgment, would be prejudicial to the safety, peace, character or reputation of the Building or of any tenant of the Property.

2. The toilet rooms, water closets, sinks, faucets, plumbing and other service apparatus of any kind shall not be used by the Tenant for any purpose other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith by the Tenant, or left by the Tenant in the lobbies, passages, elevators or stairways of the Building.

3. No skylight, window, door or transom of the Building shall be covered or obstructed by the Tenant, and no window shade, blind, curtain, screen, storm window, awning or other material shall be installed or placed on any window or in any window space, except as approved in writing by the Landlord. If the Landlord has installed or hereafter installs any shade, blind or curtain in the Premises, the Tenant shall not remove it without first obtaining the Landlord's written consent thereto.

4. No sign, lettering, insignia, advertisement, notice or other thing shall be inscribed, painted, installed, erected or placed in any portion of the Premises which may be seen from outside the Building, or on any window, window space or other part of the exterior or interior of the Building, unless first approved in writing by the Landlord. Names on suite entrances shall be provided by and only by the Landlord and at the Tenant's expense, using in each instance lettering of a design and in a form consistent with the other lettering in the Building, and first approved in writing by the Landlord. The Tenant shall/will not erect any stand, booth or showcase or other article or matter in or upon the Premises and/or the Building without first obtaining the Landlord's written consent thereto.

5. The Tenant shall not place any additional lock upon any door within the Premises or elsewhere upon the Property, and shall surrender all keys for all such locks at the end of the Term. The Landlord shall provide the Tenant with one set of keys to the Premises when the Tenant assumes possession thereof.

6. The delivery of towels, ice, water, food, beverages, newspaper and other supplies, equipment and furniture will be permitted only under the Landlord's direction and control.

7. The Tenant shall not do or permit to be done anything which obstructs or interferes with the rights of any other tenant of the Property. The Tenant shall not keep anywhere within the Property any matter having an offensive odor, or any kerosene, gasoline, benzine, camphene, fuel or other explosive or highly flammable material. No bird, fish or other animal shall be brought into or kept in or about the Premises.

EXHIBIT C - CURRENT RULES AND REGULATIONS
PAGE TWO (2)

8. So that the Premises may be kept in a good state of preservation and cleanliness, the Tenant shall, while in possession of the Premises, permit only the Landlord's employees and contractors to clean the Premises unless prior thereto the Landlord otherwise consents in writing. The Landlord shall not be responsible to the Tenant for any damage done to any furniture or other property of the Tenant or any other person caused by any of the Landlord's employees or any other person, for any loss sustained by any of the Tenant's employees, or for any loss of property of any kind in or from the Premises, however occurring. The Tenant shall see each day that the windows are closed and the doors securely locked before leaving the Premises, and that all lights and standard office equipment within the Premises are turned off.

9. If the Tenant desires to install signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices within the Premises, the Landlord shall direct where and how they are to be installed and, except as so directed, no installation, boring or cutting shall be permitted. The Landlord shall have the right (a) to prevent or interrupt the transmission of excessive, dangerous or annoying current of electricity or otherwise into or through the Building or the Premises, (b) to require the changing of wiring connections or layout at the Tenant's expense, to the extent that the Landlord may deem necessary, (c) to require compliance with such reasonable rules as the Landlord may establish relating thereto, and (d) in the event of noncompliance with such requirements or rules, immediately to cut wiring or do whatever else it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. Each wire installed by the Tenant must be clearly tagged at each distributing board and junction box and elsewhere where required by Landlord, with the number of the office to which such wire leads and the purpose for which it is used, together with the name of the tenant or other concern, if any, operating or using it.

10. A directory will be provided by the Landlord on the ground floor of the Building, on which the Tenant's name may be placed.

11. No furniture, package, equipment, supplies or merchandise may be received in the Building, or carried up or down in the elevators or stairways, except during such hours as are designated for such purpose by the Landlord, and only after Tenant gives notice thereof to the Landlord. The Landlord shall have the exclusive right to prescribe the method and manner in which any of the same is brought into or taken out of the Building, and the right to exclude from the Building any heavy furniture, safe or other article which may create a hazard and to require it to be located at a designated place in the Premises. The Tenant shall not place any weight anywhere beyond the safe carrying capacity of the Building. The cost of repairing any damage to the Building or any other part of the Property caused by taking any of the same in or out of the Premises, or any damage caused while it is in the Premises or the rest of the Building, shall be borne by the Tenant.

12. Without the Landlord's prior written consent, (a) nothing shall be fastened to (and no hole shall be drilled, or nail or screw driven into) any wall or partition, (b) no wall, or partition shall be painted, papered or otherwise covered or moved in any way or marked or broken, (c) no connection shall be made to any electrical wire for running any fan, motor or other apparatus, device or equipment, (d) no machinery of any kind other than customary small business machinery shall be allowed in the Premises, (e) no switchboard or telephone wiring or equipment shall be placed anywhere other than where designated by the Landlord, and (f) no mechanic shall be allowed to work in or about the Building other than one employed by the Landlord, unless approved in writing by Landlord.

13. The Tenant shall have access to the Premises at all reasonable times. The Landlord shall in no event be responsible for admitting or excluding any person from the Premises. In case of invasion, hostile attack, insurrection, mob violence, riot, public excitement or other commotion, explosion, fire or any casualty, the Landlord shall have the right to bar or limit access to the Building to protect the safety of occupants of the Property, or any property within the Property.

EXHIBIT C – CURRENT RULES AND REGULATIONS
PAGE THREE (3)

14. The Landlord shall have the right to rescind, suspend or modify the Rules and Regulations and to promulgate such other Rules or Regulations as, in the Landlord's reasonable judgment, are from time to time needed for the safety, care, maintenance, operation and cleanliness of the Building, or for the preservation of good order therein. Upon the Tenant's having been given notice of the taking of any such action, the Rules and Regulations as so rescinded, suspended, modified or promulgated shall have the same force and effect as if in effect at the time at which the Tenant's lease was entered into (except that nothing in the Rules and Regulations shall be deemed in any way to alter or impair any provision of such lease).

15. The use of any room within the Building as sleeping quarters is strictly prohibited at all times.

16. The Tenant shall keep the windows and doors of the Premises (including those opening on corridors and all doors between rooms entitled to receive heating or air conditioning service and rooms not entitled to receive such service), closed while the heating or air conditioning system is operating, in order to minimize the energy used by, and to conserve the effectiveness of, such systems. The Tenant shall comply with all reasonable Rules and Regulations from time to time promulgated by the Landlord with respect to such systems or their use.

17. Nothing in these Rules and Regulations shall give any Tenant any right or claim against the Landlord or any other person if the Landlord does not enforce any of them against any other tenant or person (whether or not the Landlord has the right to enforce them against such tenant or person), and no such nonenforcement with respect to any tenant shall constitute a waiver of the right to enforce them as to the Tenant or any other tenant or person.

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT D

BASE RENT

| LEASE YEAR | SQUARE FEET | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|---|
| Lease Commencement – Phase II Commencement Date | 1,800 | n/a | $2,625.00 |
| Lease Year 1 | 9,915 | $312,322.50 | $26,026.88 |
| Lease Year 2 | 9,915 | $320,130.56 | $26,677.55 |
| Lease Year 3 | 9,915 | $328,133.83 | $27,344.49 |
| Lease Year 4 | 9,915 | $336,337.17 | $28,028.10 |
| Lease Year 5 | 9,915 | $344,745.60 | $28,728.80 |
| Lease Year 6 | 9,915 | $364,575.60 | $30,381.30 |
| Lease Year 7 | 9,915 | $373,689.99 | $31,140.83 |
| Lease Year 8 | 9,915 | $383,032.24 | $31,919.35 |
| Lease Year 9 | 9,915 | $392,608.05 | $32,717.34 |
| Lease Year 10 | 9,915 | $402,423.25 | $33,535.27 |

**AGREEMENT OF LEASE**
by and between

**1627 K ASSOCIATES LIMITED PARTNERSHIP**

and

**HARRISON CAREER INSTITUTE**

**EXHIBIT E**

**LEASE ADDENDUMS**

Addendums to the Lease dated _____, 2003 between **1627 K ASSOCIATES LIMITED PARTNERSHIP**, as "Landlord", and **HARRISON CAREER INSTITUTE**, as "Tenant". Landlord and Tenant hereby agree as follows:

1.  **Initial Premises.** Effective upon the Commencement Date, Tenant shall have access to the Initial Premises for its use and occupancy during the accreditation process. Landlord, at Tenant's sole cost and expense and subject to the approval of Landlord, shall construct the Initial Premises to facilitate the accreditation process in accordance with the terms of Section 5.1.1.(a). In the event Tenant fails to obtain the necessary approvals from the District of Columbia, as evidenced in writing from the proper governing authorities, and such failure is a result of the District of Columbia's rejection of Tenant's application for same, Tenant shall have the one time option to terminate the Lease by providing written notice to Landlord on or before December 31, 2003, time being of the essence; provided however, if Tenant has made reasonable efforts to comply with the approval X process application procedures in a timely manner and such approval has yet been obtained, or the application date is continued by the licensing authorities, the parties agree that this option to terminate shall be extended until January 31, 2004. In the event Tenant exercises its option to terminate as set forth in this paragraph, the Lease shall terminate upon Tenant's delivery of vacant possession of the Initial Premises to Landlord, in broom clean condition, normal wear and tear accepted. In the event the Lease is not terminated as set forth above, Tenant shall continue to pay Base Rent in accordance with the terms set forth herein and shall have no further option to terminate this lease except as set forth in Section 6 of this Exhibit E.

    1.2.  **Base Rent For Initial Premises.** Effective upon the Lease Commencement Date, and continuing through April 30, 2004, unless otherwise terminated as provided for herein, Tenant shall pay Base Rent for the Initial Premises in an amount set forth in the schedule of Base Rent attached hereto as Exhibit D).

2.  **Option To Extend.** As long as (i) Tenant has not been in an Event of Default of the Lease for which it has received written notice (to the extent such notice is required pursuant to Section 13 of the Lease) during the term beyond applicable grace periods more than two (2) times during any lease year, (ii) is not in an Event of Default under the Lease at the time of its exercise of this option, and (iii) Tenant occupies at least seventy percent (70%) of the Premises, Tenant shall have one (1) option to extend this Lease in accordance with the provisions of this paragraph for an additional term of five (5) years, on all the same terms and conditions with the exception of (i) Base Rent payable under Section 2 of the Lease inclusive of (ii) the annual escalations and (iii) the base year for Operating Expenses and Real Estate Taxes, which shall be those terms then being charged for comparable transactions in Washington D.C., for space reasonably comparable to the Building (in size, location and character) and Premises taking into consideration market concessions ("Fair Market Rental"). If Tenant elects to exercise the foregoing option to extend, it shall give Landlord written notice of its election to do so on or before the date which is twelve (12) months prior to the expiration of the Term of the Lease, but not prior to sixteen (16) months prior to the expiration of the Term of the Lease, time being of the essence ("Renewal Notice"). Landlord shall furnish to Tenant, within ten (10) business days of receipt of Tenant's Renewal Notice, the proposed Base Rent for the extension term. Landlord and Tenant shall negotiate, in good faith, the Base Rent and other terms and conditions for the extension and shall have thirty (30) days to negotiate the extension. If during such thirty (30) day period the parties agree to Fair Market Rental then they shall promptly execute

and amendment to Lease stating the Base Rent agreed upon and base years for Operating Expenses and Real Estate Taxes. In the event Landlord and Tenant have not agreed to Fair Market Rental within thirty (30) days of Landlord's receipt of Tenant's Renewal Notice, Tenant may request in writing that the parties determine Fair Market Rental in accordance with the Three Broker Method as set forth in paragraph 4 below. In such an event, upon determination of the Fair Market Rental pursuant to the Three Broker Method, the parties shall promptly execute an amendment to the Lease stating the Base Rent and other applicable renewal terms and the Lease shall continue in full force and effect. Tenant acknowledges that delivery of its request to proceed with the Three Broker Method shall irrevocably bind Tenant and Landlord to renew the Lease for the applicable renewal term. In the event Tenant elects not to proceed or fails to timely provide its intent to proceed with the Three Broker Method, Tenant's option pursuant to this paragraph shall cease. This option to extend is personal to Tenant, and is not assignable except to a party to which an assignment does not require the Landlord's consent. Tenant has no option(s) to extend this Lease except as set forth in this paragraph.

3. **Right of Offer.** Provided (i) Tenant has not been in an Event of Default of the Lease for which it has received written notice (to the extent such notice is required pursuant to Section 13 of the Lease) during the term beyond applicable grace periods more than two (2) times during any lease year, (ii) is not in an Event of Default under the Lease at the time of its exercise of this option, (iii) Tenant occupies at least seventy percent (70%) of the Premises and (iv) subject to the rights of existing tenants in the Building as of the execution date hereof, Tenant shall have a Right of Offer to lease additional space as it becomes available for lease on the ninth (9th) and eleventh (11th) floors of the Building (the "Offer Space"), subject to the limitations herein, provided this option is exercised in connection with an expansion of Tenant's Premises and for no other purpose. In the event the Offer Space becomes available for lease during the Term, Landlord shall give notice thereof to Tenant which notice shall contain the terms under which Landlord is willing to lease the Offer Space. The rental rate for the Offer Space shall be the Fair Market Rental as set forth in paragraph 2 above. Within ten (10) business days of such notice, time being of the essence, Tenant shall give Landlord notice that it either does or does not wish to lease the Offer Space. In the event Tenant's notice provides that it does not wish to lease the Offer Space or if Tenant fails to give Landlord notice of its desires respecting the Offer Space within the foregoing required ten (10) business day period, then Landlord shall be entitled to proceed to market and/or lease the Offer Space to a third party free and clear of Tenant's Right of Offer. In the event Tenant gives Landlord a notice as required above that it wishes to lease the Offer Space (the "Expansion Acceptance Notice"), then Landlord and Tenant shall have twenty (20) business days from the date of the notice within which to negotiate, in good faith, the Fair Market Rental and amend this Lease by adding the Offer Space, provided however that the term for the Offer Space shall be the greater of (i) three years or (ii) the then remaining term of the Lease. In the event Landlord and Tenant have not agreed to Fair Market Rental within thirty (30) days of Landlord's receipt of Tenant's Expansion Acceptance Notice, Tenant may request in writing that the parties determine Fair Market Rental in accordance with the Three Broker Method as hereinafter provided. Tenant acknowledges that delivery of its request to proceed with the Three Broker Method shall irrevocably bind Tenant to Lease the Offer Space. In the event Tenant elects not to proceed or fails to timely provide its request to Landlord of its intent to proceed with the Three Broker Method, Tenant's option pursuant to this paragraph shall cease. This option is personal to Tenant, and is not assignable except in the event of a Transfer which does not require Landlord's consent. Tenant has no option(s) to expand this Lease except as set forth in this paragraph.

4. **Three Broker Method.** For purposes of this Lease, the Three Broker Method shall be the following process: The parties shall each appoint an independent real estate broker who is licensed in the District Of Columbia, specializes in the field of commercial office space leasing in the primary business districts of Washington, D.C., has at least seven (7) years of experience and is recognized within the field as being reputable and ethical. Such two individuals shall each determine the Fair Market Rental within ten (10) business days after their appointment. If such two brokers agree on such Fair Market Rental, then the rent for the applicable term and space shall be such Fair Market Rental as determined by the parties. If such individuals do not agree on Fair Market Rental within such ten (10) business day period, but such brokers' determination of Fair Market Rental are within five percent (5%) of each others determinations, the average of the two determinations shall be the Fair Market Rental for the applicable term and space. If such individuals do not agree on Fair Market Rental within such ten (10) business day period and the higher determination of the market rate base rent is more than five percent (5%) higher than the lower determination, then the two (2) individuals shall, within five (5) additional days, render separate written reports of their

determinations and together appoint a third similarly qualified individual. The third individual shall within fifteen (15) days after his or her appointment make a determination of Fair Market Rental. The Fair Market Rental applicable shall equal the average of the two (2) closest determinations of the three broker's determinations. Upon the determination of the Fair Market Rental in accordance with the Three Broker Method, regardless of whether such Fair Market Rental were determined by two (2) or three (3) brokers pursuant to the terms hereof, such Base Rent, base year, and escalations shall be final and conclusive. Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker.

5. **Compliance with Codes.** Landlord shall be responsible for compliance with codes and laws as they pertain to the Building and its common areas, including but not limited to the Americans With Disabilities Act and fire and life safety, and Tenant shall be responsible for compliance with codes and laws, including the American With Disabilities Act and fire and life safety, as they pertain to the Premises. Tenant shall not be required to make structural changes or changes to the Building's systems unless such changes are caused or necessitated by Tenant's use or occupancy of the Premises.

6. **Termination Option.** Provided Tenant has not been in an Event of Default of the Lease beyond applicable cure periods during the Term, Tenant shall have the one (1) time option to terminate the Lease at the conclusion of the fifth (5th) lease year by providing not less than twelve (12) months prior written notice to Landlord of its intent to so terminate. In the event Tenant elects to terminate the Lease and as a condition precedent to the effectiveness thereof, Tenant shall pay to Landlord a termination fee equal to (i) the unamortized Allowance paid by Landlord based on a ten-year straight-line amortization schedule at an interest rate of eight percent (8%) per annum and (ii) an amount equal to two (2) months Base Rent payable as of the end of the fifth (5th) lease year. Said fee shall be paid at the time Tenant exercises its right to terminate and shall be in addition to, and not in lieu of, the rental payments due and payable hereunder through the effective date of termination hereof.

7. **Supplemental HVAC.** Subject to Landlord's approval of the type, location and design, which approval shall not be unreasonably withheld, Tenant, at its sole cost and expense, may install supplemental Heating, Ventilation and Air Conditioning (HVAC) units in or serving the classrooms and "break out" areas. Tenant shall cause the units to be separately metered and shall directly pay the utility provided for such service unless the service provided will not permit such service to be paid directly by Tenant in which case Landlord shall pay the cost of the utility and Tenant shall reimburse Landlord immediately upon receipt of Landlord's invoice to Tenant, which invoice shall include the amount attributable to the meter or submeter, as the case may be. Failure to pay any such amount, whether to Landlord or the utility provider, shall be deemed an Event of Default in the payment of Additional Rent under the terms hereof.

8. Landlord shall not lease any portion of the Building to any other entities which provide career path training in (i) the medical/allied health career field or (ii) computer operations/help desk analyst, personal computer support specialist with networking and computerized legal assistant. It is specifically understood that Landlord shall be permitted to lease all or any portion of the Building to other training companies, including those which may offer the same coarse as Tenant provided that the training is not in conjunction with the career based curriculum set forth in the herein.

G:\Ben B\Leases\HCI @ 1627 K FINAL.doc

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-2

SPACE PLAN

Initial Premises

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT C

CURRENT RULES AND REGULATIONS

1. The sidewalks, lobbies, passages, elevators and stairways shall not be obstructed by the Tenant and used by the Tenant for any purposes other than ingress and egress from and to the Tenant's offices. The Landlord shall in all cases retain the right to control or prevent access thereto by any person whose presence, in the Landlord's judgment, would be prejudicial to the safety, peace, character or reputation of the Building or of any tenant of the Property.

2. The toilet rooms, water closets, sinks, faucets, plumbing and other service apparatus of any kind shall not be used by the Tenant for any purpose other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith by the Tenant, or left by the Tenant in the lobbies, passages, elevators or stairways of the Building.

3. No skylight, window, door or transom of the Building shall be covered or obstructed by the Tenant, and no window shade, blind, curtain, screen, storm window, awning or other material shall be installed or placed on any window or in any window space, except as approved in writing by the Landlord. If the Landlord has installed or hereafter installs any shade, blind or curtain in the Premises, the Tenant shall not remove it without first obtaining the Landlord's written consent thereto.

4. No sign, lettering, insignia, advertisement, notice or other thing shall be inscribed, painted, installed, erected or placed in any portion of the Premises which may be seen from outside the Building, or on any window, window space or other part of the exterior or interior of the Building, unless first approved in writing by the Landlord. Names on suite entrances shall be provided by and only by the Landlord and at the Tenant's expense, using in each instance lettering of a design and in a form consistent with the other lettering in the Building, and first approved in writing by the Landlord. The Tenant shall/will not erect any stand, booth or showcase or other article or matter in or upon the Premises and/or the Building without first obtaining the Landlord's written consent thereto.

5 The Tenant shall not place any additional lock upon any door within the Premises or elsewhere upon the Property, and shall surrender all keys for all such locks at the end of the Term. The Landlord shall provide the Tenant with one set of keys to the Premises when the Tenant assumes possession thereof.

6. The delivery of towels, ice, water, food, beverages, newspaper and other supplies, equipment and furniture will be permitted only under the Landlord's direction and control.

7. The Tenant shall not do or permit to be done anything which obstructs or interferes with the rights of any other tenant of the Property. The Tenant shall not keep anywhere within the Property any matter having an offensive odor, or any kerosene, gasoline, benzine, camphene, fuel or other explosive or highly flammable material. No bird, fish or other animal shall be brought into or kept in or about the Premises.

**EXHIBIT C – CURRENT RULES AND REGULATIONS**
**PAGE TWO (2)**

8. So that the Premises may be kept in a good state of preservation and cleanliness, the Tenant shall, while in possession of the Premises, permit only the Landlord's employees and contractors to clean the Premises unless prior thereto the Landlord otherwise consents in writing. The Landlord shall not be responsible to the Tenant for any damage done to any furniture or other property of the Tenant or any other person caused by any of the Landlord's employees or any other person, for any loss sustained by any of the Tenant's employees, or for any loss of property of any kind in or from the Premises, however occurring. The Tenant shall see each day that the windows are closed and the doors securely locked before leaving the Premises, and that all lights and standard office equipment within the Premises are turned off.

9. If the Tenant desires to install signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices within the Premises, the Landlord shall direct where and how they are to be installed and, except as so directed, no installation, boring or cutting shall be permitted. The Landlord shall have the right (a) to prevent or interrupt the transmission of excessive, dangerous or annoying current of electricity or otherwise into or through the Building or the Premises, (b) to require the changing of wiring connections or layout at the Tenant's expense, to the extent that the Landlord may deem necessary, (c) to require compliance with such reasonable rules as the Landlord may establish relating thereto, and (d) in the event of noncompliance with such requirements or rules, immediately to cut wiring or do whatever else it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. Each wire installed by the Tenant must be clearly tagged at each distributing board and junction box and elsewhere where required by Landlord, with the number of the office to which such wire leads and the purpose for which it is used, together with the name of the tenant or other concern, if any, operating or using it.

10. A directory will be provided by the Landlord on the ground floor of the Building, on which the Tenant's name may be placed.

11. No furniture, package, equipment, supplies or merchandise may be received in the Building, or carried up or down in the elevators or stairways, except during such hours as are designated for such purpose by the Landlord, and only after Tenant gives notice thereof to the Landlord. The Landlord shall have the exclusive right to prescribe the method and manner in which any of the same is brought into or taken out of the Building, and the right to exclude from the Building any heavy furniture, safe or other article which may create a hazard and to require it to be located at a designated place in the Premises. The Tenant shall not place any weight anywhere beyond the safe carrying capacity of the Building. The cost of repairing any damage to the Building or any other part of the Property caused by taking any of the same in or out of the Premises, or any damage caused while it is in the Premises or the rest of the Building, shall be borne by the Tenant.

12. Without the Landlord's prior written consent, (a) nothing shall be fastened to (and no hole shall be drilled, or nail or screw driven into) any wall or partition, (b) no wall, or partition shall be painted, papered or otherwise covered or moved in any way or marked or broken, (c) no connection shall be made to any electrical wire for running any fan, motor or other apparatus, device or equipment, (d) no machinery of any kind other than customary small business machinery shall be allowed in the Premises, (e) no switchboard or telephone wiring or equipment shall be placed anywhere other than where designated by the Landlord, and (f) no mechanic shall be allowed to work in or about the Building other than one employed by the Landlord, unless approved in writing by Landlord.

13. The Tenant shall have access to the Premises at all reasonable times. The Landlord shall in no event be responsible for admitting or excluding any person from the Premises. In case of invasion, hostile attack, insurrection, mob violence, riot, public excitement or other commotion, explosion, fire or any casualty, the Landlord shall have the right to bar or limit access to the Building to protect the safety of occupants of the Property, or any property within the Property.

**EXHIBIT C – CURRENT RULES AND REGULATIONS**
**PAGE THREE (3)**

14. The Landlord shall have the right to rescind, suspend or modify the Rules and Regulations and to promulgate such other Rules or Regulations as, in the Landlord's reasonable judgment, are from time to time needed for the safety, care, maintenance, operation and cleanliness of the Building, or for the preservation of good order therein. Upon the Tenant's having been given notice of the taking of any such action, the Rules and Regulations as so rescinded, suspended, modified or promulgated shall have the same force and effect as if in effect at the time at which the Tenant's lease was entered into (except that nothing in the Rules and Regulations shall be deemed in any way to alter or impair any provision of such lease).

15. The use of any room within the Building as sleeping quarters is strictly prohibited at all times.

16. The Tenant shall keep the windows and doors of the Premises (including those opening on corridors and all doors between rooms entitled to receive heating or air conditioning service and rooms not entitled to receive such service), closed while the heating or air conditioning system is operating, in order to minimize the energy used by, and to conserve the effectiveness of, such systems. The Tenant shall comply with all reasonable Rules and Regulations from time to time promulgated by the Landlord with respect to such systems or their use.

17. Nothing in these Rules and Regulations shall give any Tenant any right or claim against the Landlord or any other person if the Landlord does not enforce any of them against any other tenant or person (whether or not the Landlord has the right to enforce them against such tenant or person), and no such nonenforcement with respect to any tenant shall constitute a waiver of the right to enforce them as to the Tenant or any other tenant or person.

36

EXHIBIT C - CURRENT RULES AND REGULATIONS
PAGE TWO (2)

8. So that the Premises may be kept in a good state of preservation and cleanliness, the Tenant shall, while in possession of the Premises, permit only the Landlord's employees and contractors to clean the Premises unless prior thereto the Landlord otherwise consents in writing. The Landlord shall not be responsible to the Tenant for any damage done to any furniture or other property of the Tenant or any other person caused by any of the Landlord's employees or any other person, for any loss sustained by any of the Tenant's employees, or for any loss of property of any kind in or from the Premises, however occurring. The Tenant shall see each day that the windows are closed and the doors securely locked before leaving the Premises, and that all lights and standard office equipment within the Premises are turned off.

9. If the Tenant desires to install signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices within the Premises, the Landlord shall direct where and how they are to be installed and, except as so directed, no installation, boring or cutting shall be permitted. The Landlord shall have the right (a) to prevent or interrupt the transmission of excessive, dangerous or annoying current of electricity or otherwise into or through the Building or the Premises, (b) to require the changing of wiring connections or layout at the Tenant's expense, to the extent that the Landlord may deem necessary, (c) to require compliance with such reasonable rules as the Landlord may establish relating thereto, and (d) in the event of noncompliance with such requirements or rules, immediately to cut wiring or do whatever else it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. Each wire installed by the Tenant must be clearly tagged at each distributing board and junction box and elsewhere where required by Landlord, with the number of the office to which such wire leads and the purpose for which it is used, together with the name of the tenant or other concern, if any, operating or using it.

10. A directory will be provided by the Landlord on the ground floor of the Building, on which the Tenant's name may be placed.

11. No furniture, package, equipment, supplies or merchandise may be received in the Building, or carried up or down in the elevators or stairways, except during such hours as are designated for such purpose by the Landlord, and only after Tenant gives notice thereof to the Landlord. The Landlord shall have the exclusive right to prescribe the method and manner in which any of the same is brought into or taken out of the Building, and the right to exclude from the Building any heavy furniture, safe or other article which may create a hazard and to require it to be located at a designated place in the Premises. The Tenant shall not place any weight anywhere beyond the safe carrying capacity of the Building. The cost of repairing any damage to the Building or any other part of the Property caused by taking any of the same in or out of the Premises, or any damage caused while it is in the Premises or the rest of the Building, shall be borne by the Tenant.

12. Without the Landlord's prior written consent, (a) nothing shall be fastened to (and no hole shall be drilled, or nail or screw driven into) any wall or partition, (b) no wall, or partition shall be painted, papered or otherwise covered or moved in any way or marked or broken, (c) no connection shall be made to any electrical wire for running any fan, motor or other apparatus, device or equipment, (d) no machinery of any kind other than customary small business machinery shall be allowed in the Premises, (e) no switchboard or telephone wiring or equipment shall be placed anywhere other than where designated by the Landlord, and (f) no mechanic shall be allowed to work in or about the Building other than one employed by the Landlord, unless approved in writing by Landlord.

13. The Tenant shall have access to the Premises at all reasonable times. The Landlord shall in no event be responsible for admitting or excluding any person from the Premises. In case of invasion, hostile attack, insurrection, mob violence, riot, public excitement or other commotion, explosion, fire or any casualty, the Landlord shall have the right to bar or limit access to the Building to protect the safety of occupants of the Property, or any property within the Property.

-35-

EXHIBIT C – CURRENT RULES AND REGULATIONS
PAGE THREE (3)

14. The Landlord shall have the right to rescind, suspend or modify the Rules and Regulations and to promulgate such other Rules or Regulations as, in the Landlord's reasonable judgment, are from time to time needed for the safety, care, maintenance, operation and cleanliness of the Building, or for the preservation of good order therein. Upon the Tenant's having been given notice of the taking of any such action, the Rules and Regulations as so rescinded, suspended, modified or promulgated shall have the same force and effect as if in effect at the time at which the Tenant's lease was entered into (except that nothing in the Rules and Regulations shall be deemed in any way to alter or impair any provision of such lease).

15. The use of any room within the Building as sleeping quarters is strictly prohibited at all times.

16. The Tenant shall keep the windows and doors of the Premises (including those opening on corridors and all doors between rooms entitled to receive heating or air conditioning service and rooms not entitled to receive such service), closed while the heating or air conditioning system is operating, in order to minimize the energy used by, and to conserve the effectiveness of, such systems. The Tenant shall comply with all reasonable Rules and Regulations from time to time promulgated by the Landlord with respect to such systems or their use.

17. Nothing in these Rules and Regulations shall give any Tenant any right or claim against the Landlord or any other person if the Landlord does not enforce any of them against any other tenant or person (whether or not the Landlord has the right to enforce them against such tenant or person), and no such nonenforcement with respect to any tenant shall constitute a waiver of the right to enforce them as to the Tenant or any other tenant or person.

**AGREEMENT OF LEASE**
by and between

**1627 K ASSOCIATES LIMITED PARTNERSHIP**

and

**HARRISON CAREER INSTITUTE**

**EXHIBIT D**

**BASE RENT**

| LEASE YEAR | SQUARE FEET | ANNUAL BASE RENT | MONTHLY BASE RENT |
|---|---|---|---|
| Lease Commencement – Phase II Commencement Date | 1,800 | n/a | $2,625.00 |
| Lease Year 1 | 9,915 | $312,322.50 | $26,026.88 |
| Lease Year 2 | 9,915 | $320,130.56 | $26,677.55 |
| Lease Year 3 | 9,915 | $328,133.83 | $27,344.49 |
| Lease Year 4 | 9,915 | $336,337.17 | $28,028.10 |
| Lease Year 5 | 9,915 | $344,745.60 | $28,728.80 |
| Lease Year 6 | 9,915 | $364,575.60 | $30,381.30 |
| Lease Year 7 | 9,915 | $373,689.99 | $31,140.83 |
| Lease Year 8 | 9,915 | $383,032.24 | $31,919.35 |
| Lease Year 9 | 9,915 | $392,608.05 | $32,717.34 |
| Lease Year 10 | 9,915 | $402,423.25 | $33,535.27 |

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT E

LEASE ADDENDUMS

Addendums to the Lease dated _____, 2003 between 1627 K ASSOCIATES LIMITED PARTNERSHIP, as "Landlord", and HARRISON CAREER INSTITUTE, as "Tenant". Landlord and Tenant hereby agree as follows:

1.    **Initial Premises.** Effective upon the Commencement Date, Tenant shall have access to the Initial Premises for its use and occupancy during the accreditation process. Landlord, at Tenant's sole cost and expense and subject to the approval of Landlord, shall construct the Initial Premises to facilitate the accreditation process in accordance with the terms of Section 5.1.1.(a). In the event Tenant fails to obtain the necessary approvals from the District of Columbia, as evidenced in writing from the proper governing authorities, and such failure is a result of the District of Columbia's rejection of Tenant's application for same, Tenant shall have the one time option to terminate the Lease by providing written notice to Landlord on or before December 31, 2003, time being of the essence; provided however, if Tenant has made reasonable efforts to comply with the approval X process application procedures in a timely manner and such approval has yet been obtained, or the application date is continued by the licensing authorities, the parties agree that this option to terminate shall be extended until January 31, 2004. In the event Tenant exercises its option to terminate as set forth in this paragraph, the Lease shall terminate upon Tenant's delivery of vacant possession of the Initial Premises to Landlord, in broom clean condition, normal wear and tear accepted. In the event the Lease is not terminated as set forth above, Tenant shall continue to pay Base Rent in accordance with the terms set forth herein and shall have no further option to terminate this lease except as set forth in Section 6 of this Exhibit E.

1.2.    **Base Rent For Initial Premises.** Effective upon the Lease Commencement Date, and continuing through April 30, 2004, unless otherwise terminated as provided for herein, Tenant shall pay Base Rent for the Initial Premises in an amount set forth in the schedule of Base Rent attached hereto as Exhibit D).

2.    **Option To Extend.** As long as (i) Tenant has not been in an Event of Default of the Lease for which it has received written notice (to the extent such notice is required pursuant to Section 13 of the Lease) during the term beyond applicable grace periods more than two (2) times during any lease year, (ii) is not in an Event of Default under the Lease at the time of its exercise of this option, and (iii) Tenant occupies at least seventy percent (70%) of the Premises, Tenant shall have one (1) option to extend this Lease in accordance with the provisions of this paragraph for an additional term of five (5) years, on all the same terms and conditions with the exception of (i) Base Rent payable under Section 2 of the Lease inclusive of (ii) the annual escalations and (iii) the base year for Operating Expenses and Real Estate Taxes, which shall be those terms then being charged for comparable transactions in Washington D.C., for space reasonably comparable to the Building (in size, location and character) and Premises taking into consideration market concessions ("Fair Market Rental"). If Tenant elects to exercise the foregoing option to extend, it shall give Landlord written notice of its election to do so on or before the date which is twelve (12) months prior to the expiration of the Term of the Lease, but not prior to sixteen (16) months prior to the expiration of the Term of the Lease, time being of the essence ("Renewal Notice"). Landlord shall furnish to Tenant, within ten (10) business days of receipt of Tenant's Renewal Notice, the proposed Base Rent for the extension term. Landlord and Tenant shall negotiate, in good faith, the Base Rent and other terms and conditions for the extension and shall have thirty (30) days to negotiate the extension. If during such thirty (30) day period the parties agree to Fair Market Rental then they shall promptly execute

and amendment to Lease stating the Base Rent agreed upon and base years for Operating Expenses and Real Estate Taxes. In the event Landlord and Tenant have not agreed to Fair Market Rental within thirty (30) days of Landlord's receipt of Tenant's Renewal Notice, Tenant may request in writing that the parties determine Fair Market Rental in accordance with the Three Broker Method as set forth in paragraph 4 below. In such an event, upon determination of the Fair Market Rental pursuant to the Three Broker Method, the parties shall promptly execute an amendment to the Lease stating the Base Rent and other applicable renewal terms and the Lease shall continue in full force and effect. Tenant acknowledges that delivery of its request to proceed with the Three Broker Method shall irrevocably bind Tenant and Landlord to renew the Lease for the applicable renewal term. In the event Tenant elects not to proceed or fails to timely provide its request to proceed with the Three Broker Method, Tenant's option pursuant to this paragraph shall cease. This option to extend is personal to Tenant, and is not assignable pursuant to this paragraph shall an assignment does not require the Landlord's consent. Tenant has no option(s) to extend this Lease except as set forth in this paragraph.

3.    **Right of Offer.** Provided (i) Tenant has not been in an Event of Default of the Lease for which it has received written notice (to the extent such notice is required pursuant to Section 13 of the Lease) during the term beyond applicable grace periods more than two (2) times during any lease year, (ii) is not in an Event of Default under the Lease at the time of its exercise of this option, (iii) Tenant occupies at least seventy percent (70%) of the Premises and (iv) subject to the rights of existing tenants in the Building as of the execution date hereof, Tenant shall have a Right of Offer to lease additional space as it becomes available for lease on the ninth (9th) and eleventh (11th) floors of the Building (the "Offer Space"), subject to the limitations herein, provided this option is exercised in connection with an expansion of Tenant's Premises and for no other purpose. In the event the Offer Space becomes available for lease during the Term, Landlord shall give notice thereof to Tenant which notice shall contain the terms under which Landlord is willing to lease the Offer Space. The rental rate for the Offer Space shall be the Fair Market Rental as set forth in paragraph 2 above. Within ten (10) business days of such notice, time being of the essence, Tenant shall give Landlord notice that it either does or does not wish to lease the Offer Space. In the event Tenant's notice provides that it does not wish to lease the Offer Space or if Tenant fails to give Landlord notice of its desires respecting the Offer Space within the foregoing required ten (10) business day period, then Landlord shall be entitled to proceed to market and/or lease the Offer Space to a third party free and clear of Tenant's Right of Offer. In the event Tenant gives Landlord a notice as required above that it wishes to lease the Offer Space (the "Expansion Acceptance Notice"), then Landlord and Tenant shall have twenty (20) business days from the date of the notice within which to negotiate, in good faith, the Fair Market Rental and amend this Lease by adding the Offer Space, provided however that the term for the Offer Space shall be the greater of (i) three years or (ii) the then remaining term of the Lease. In the event Landlord and Tenant have not agreed to Fair Market Rental within thirty (30) days of Landlord's receipt of Tenant's Expansion Acceptance Notice, Tenant may request in writing that the parties determine Fair Market Rental in accordance with the Three Broker Method as hereinafter provided. Tenant acknowledges that delivery of its request to proceed with the Three Broker Method shall irrevocably bind Tenant to Lease the Offer Space. In the event Tenant elects not to proceed or fails to timely provide its request to Landlord of its intent to proceed with the Three Broker Method, Tenant's option pursuant to this paragraph shall cease. This option is personal to Tenant, and is not assignable except in the event of a Transfer which does not require Landlord's consent. Tenant has no option(s) to expand this Lease except as set forth in this paragraph.

4.    **Three Broker Method.** For purposes of this Lease, the Three Broker Method shall be the following process: The parties shall each appoint an independent real estate broker who is licensed in the District Of Columbia, specializes in the field of commercial office space leasing in the primary business districts of Washington, D.C., has at least seven (7) years of experience and is recognized within the field as being reputable and ethical. Such two individuals shall each determine the Fair Market Rental within ten (10) business days after their appointment. If such two brokers agree on such Fair Market Rental, then the rent for the applicable term and space shall be such Fair Market Rental as determined by the parties. If such individuals do not agree on Fair Market Rental within such ten (10) business day period, but such brokers' determination of Fair Market Rental are within five percent (5%) of each others determinations, the average of the two determinations shall be the Fair Market Rental for the applicable term and space. If such individuals do not agree on Fair Market Rental within such ten (10) business day period and the higher determination of the market rate base rent is more than five percent (5%) higher than the lower determination, then the two (2) individuals shall, within five (5) additional days, render separate written reports of their

determinations and together appoint a third similarly qualified individual. The third individual shall within fifteen (15) days after his or her appointment make a determination of Fair Market Rental. The Fair Market Rental applicable shall equal the average of the two (2) closest determinations of the three broker's determinations. Upon the determination of the Fair Market Rental in accordance with the Three Broker Method, regardless of whether such Fair Market Rental were determined by two (2) or three (3) brokers pursuant to the terms hereof, such Base Rent, base year, and escalations shall be final and conclusive. Landlord and Tenant shall each bear the cost of its broker and shall share equally the cost of the third broker.

5. **Compliance with Codes.** Landlord shall be responsible for compliance with codes and laws as they pertain to the Building and its common areas, including but not limited to the Americans With Disabilities Act and fire and life safety, and Tenant shall be responsible for compliance with codes and laws, including the American With Disabilities Act and fire and life safety, as they pertain to the Premises. Tenant shall not be required to make structural changes or changes to the Building's systems unless such changes are caused or necessitated by Tenant's use or occupancy of the Premises.

6. **Termination Option.** Provided Tenant has not been in an Event of Default of the Lease beyond applicable cure periods during the Term, Tenant shall have the one (1) time option to terminate the Lease at the conclusion of the fifth (5th) lease year by providing not less than twelve (12) months prior written notice to Landlord of its intent to so terminate. In the event Tenant elects to terminate the Lease and as a condition precedent to the effectiveness thereof, Tenant shall pay to Landlord a termination fee equal to (i) the unamortized Allowance paid by Landlord based on a ten-year straight-line amortization schedule at an interest rate of eight percent (8%) per annum and (ii) an amount equal to two (2) months Base Rent payable as of the end of the fifth (5th) lease year. Said fee shall be paid at the time Tenant exercises its right to terminate and shall be in addition to, and not in lieu of, the rental payments due and payable hereunder through the effective date of termination hereof.

7. **Supplemental HVAC.** Subject to Landlord's approval of the type, location and design, which approval shall not be unreasonably withheld, Tenant, at its sole cost and expense, may install supplemental Heating, Ventilation and Air Conditioning (HVAC) units in or serving the classrooms and "break out" areas. Tenant shall cause the units to be separately metered and shall directly pay the utility provided for such service unless the service provided will not permit such service to be paid directly by Tenant in which case Landlord shall pay the cost of the utility and Tenant shall reimburse Landlord immediately upon receipt of Landlord's invoice to Tenant, which invoice shall include the amount attributable to the meter or submeter, as the case may be. Failure to pay any such amount, whether to Landlord or the utility provider, shall be deemed an Event of Default in the payment of Additional Rent under the terms hereof.

8. Landlord shall not lease any portion of the Building to any other entities which provide career path training in (i) the medical/allied health career field or (ii) computer operations/help desk analyst, personal computer support specialist with networking and computerized legal assistant. It is specifically understood that Landlord shall be permitted to lease all or any portion of the Building to other training companies, including those which may offer the same coarse as Tenant provided that the training is not in conjunction with the career based curriculum set forth in the herein.

G:\Ben B\Leases\HCI @ 1627 K FINAL.doc

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-1 (a)

SPACE PLAN

Ninth (9th) Floor

**AGREEMENT OF LEASE**
by and between

**1627 K ASSOCIATES LIMITED PARTNERSHIP**

**and**

**HARRISON CAREER INSTITUTE**

**EXHIBIT B-1 (b)**

**SPACE PLAN**

Tenth (10th) Floor

AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT B-2

SPACE PLAN

Initial Premises



AGREEMENT OF LEASE
by and between

1627 K ASSOCIATES LIMITED PARTNERSHIP

and

HARRISON CAREER INSTITUTE

EXHIBIT C


# CURRENT RULES AND REGULATIONS

1. The sidewalks, lobbies, passages, elevators and stairways shall not be obstructed by the Tenant and used by the Tenant for any purposes other than ingress and egress from and to the Tenant's offices. The Landlord shall in all cases retain the right to control or prevent access thereto by any person whose presence, in the Landlord's judgment, would be prejudicial to the safety, peace, character or reputation of the Building or of any tenant of the Property.

2. The toilet rooms, water closets, sinks, faucets, plumbing and other service apparatus of any kind shall not be used by the Tenant for any purpose other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith by the Tenant, or left by the Tenant in the lobbies, passages, elevators or stairways of the Building.

3. No skylight, window, door or transom of the Building shall be covered or obstructed by the Tenant, and no window shade, blind, curtain, screen, storm window, awning or other material shall be installed or placed on any window or in any window space, except as approved in writing by the Landlord. If the Landlord has installed or hereafter installs any shade, blind or curtain in the Premises, the Tenant shall not remove it without first obtaining the Landlord's written consent thereto.

4. No sign, lettering, insignia, advertisement, notice or other thing shall be inscribed, painted, installed, erected or placed in any portion of the Premises which may be seen from outside the Building, or on any window, window space or other part of the exterior or interior of the Building, unless first approved in writing by the Landlord. Names on suite entrances shall be provided by and only by the Landlord and at the Tenant's expense, using in each instance lettering of a design and in a form consistent with the other lettering in the Building, and first approved in writing by the Landlord. The Tenant shall/will not erect any stand, booth or showcase or other article or matter in or upon the Premises and/or the Building without first obtaining the Landlord's written consent thereto.

5. The Tenant shall not place any additional lock upon any door within the Premises or elsewhere upon the Property, and shall surrender all keys for all such locks at the end of the Term. The Landlord shall provide the Tenant with one set of keys to the Premises when the Tenant assumes possession thereof.

6. The delivery of towels, ice, water, food, beverages, newspaper and other supplies, equipment and furniture will be permitted only under the Landlord's direction and control.

7. The Tenant shall not do or permit to be done anything which obstructs or interferes with the rights of any other tenant of the Property. The Tenant shall not keep anywhere within the Property any matter having an offensive odor, or any kerosene, gasoline, benzine, camphene, fuel or other explosive or highly flammable material. No bird, fish or other animal shall be brought into or kept in or about the Premises.